# EXHIBIT A

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | |

(12/31/15) CCG N001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Citadel Securities LLC, Ronin Capital, LLC, Susquehanna
Securities and Susquehanna Investment Group,

_____
(Name all parties)

v.

Chicago Board Options Exchange, Inc., International Securities
Exchange, LLC, NASDAQ PHLX LLC, NYSE Arca, Inc., and
NYSE MKT LLC.
_____

No. _____

2016CH12154
CALENDAR/ROOM 10
TIME 00:00
Declaratory Jdgmt

### ⊗ SUMMONS ○ ALIAS SUMMONS

To each Defendant: See attached service list

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _____, Chicago, Illinois 60602
☐ District 2 - Skokie      ☐ District 3 - Rolling Meadows      ☐ District 4 - Maywood
    5600 Old Orchard Rd.      2121 Euclid 1500      Maybrook Ave.
    Skokie, IL 60077      Rolling Meadows, IL 60008      Maywood, IL 60153
☐ District 5 - Bridgeview      ☐ District 6 - Markham      ☐ Child Support: 50 W.
    10220 S. 76th Ave.      16501 S. Kedzie Pkwy.      Washington, LL-01,
    Bridgeview, IL 60455      Markham, IL 60428      Chicago, IL 60602

You must file within 30 days after service of this Summons, not counting the day of service.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

☑ Atty. No.: 17190

Name: Foley & Lardner LLP

Atty. for: Plaintiffs

Address: 321 North Clark Street, Suite 2800

City/State/Zip Code: Chicago, Illinois 60654-5313

Telephone: 312.832.4500

Primary Email Address:
ewheeler@foley.com

Secondary Email Address(es):
sbedell@foley.com; tkrebs@foley.com; jbritt@foley.com

Witness DOROTHY BROWN SEP 14 2016

_____
DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person)

**Service by Facsimile Transmission will be accepted at:

_____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
Page 1 of 1

**Cook County Defendants**

1. Chicago Board Options Exchange, Inc.
   400 S. LaSalle Street, Floor 1
   Chicago, Illinois 60605

2. NASDAQ PHLX LLC c/o CT Corporation System
   208 S. LaSalle Street, Suite 814
   Chicago, Illinois 60604

3. NYSE Arca, Inc.
   100 S. Wacker Drive, Suite 1800
   Chicago, Illinois 60606

**New York Defendants**

1. International Securities Exchange, LLC
   60 Broad Street, Floor 26
   New York, NY 10004

2. NYSE MKT LLC
   11 Wall Street
   New York, NY 10005



# SHERIFF'S OFFICE OF COOK COUNTY, ILLINOIS
## AFFIDAVIT OF SERVICE



*02214301*

CASE NUMBER: 16CH12154     MULT.SER. 1     DOC. TYPE: CHANCERY

**DIE DATE: 10/07/2016**    RECEIVED DATE: 9/15/2016     FILED DATE: 09/14/2016     DIST: 604 DC
12:00:00 PM

| DEFENDANT | PLANTIFF |
|---|---|
| NASDAQ PHLX LLC | CITADEL SECURITIES LLC |
| 208 S LASALLE ST | **ATTORNEY** |
| CHICAGO, IL 60604 | FOLEY & LARDNER |
| STE 814 | 321 N CLARK #2800 |
| | CHICAGO, IL 60654 |
| | (312) 832-4500 |

FILED
CH-2408
SEP 27 2016
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY

**ATTACHED FEE AMOUNT:**

**SERVICE INFORMATION:**     CT CORP

**I CERTIFY THAT I SERVED THE DEFENDANT/RESPONDENT AS FOLLOWS:**

_____ **(1) PERSONAL SERVICE:**
BY LEAVING A COPY OF THE WRIT/ORDER WITH THE DEFENDANT/RESPONDENT PERSONALLY, AND INFORMING DEFENDANT/RESPONDENT OF CONTENTS.

_____ **(2) SUBSTITUTE SERVICE:**
BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT AT THE DEFENDANT'S USUAL PLACE OF ABODE WITH A FAMILY MEMBER OR PERSON RESIDING THERE, 13 YEARS OR OLDER, AND INFORMING THAT PERSON OF THE CONTENTS OF THE SUMMONS. ALSO, A COPY OF THE SUMMONS WAS MAILED TO THE DEFENDANT AT HIS OR HER USUAL PLACE OF ABODE ON THE _____ DAY OF _____ 20_____

_____ **(3) UNKNOWN OCCUPANTS:**
BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT NAMING "UNKNOWN OCCUPANTS" WITH A PERSON OF THE AGE OF 13 OR UPWARDS OCCUPYING SAID PREMISE.

✗ **(4) CORP/CO/BUS/PART:**
BY LEAVING THE APPROPRIATE NUMBER OF COPIES OF THE SUMMONS, COMPLAINTS, INTERROGATORIES, JUDGMENTS, CERTIFICATIONS AND NOTICES WITH THE REGISTERED AGENT, AUTHORIZED PERSON OR PARTNER OF THE DEFENDANT CORPORATION ____ COMPANY ____ BUSINESS ____ PARTNERSHIP ____

_____ **(5) PROPERTY RECOVERED:**
NO ONE PRESENT TO RECEIVE ORDER OF COURT. ORDER POSTED IN PLAIN VIEW.

_____ **(6) S.O.S./D.O.I.:**
BY LEAVING THE SUMMONS AND COMPLAINT WITH THE SECRETARY OF THE STATE/DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, AN AGENT OF SAID DEFENDANT LISTED ABOVE. ANY AGENT OF SAID CORPORATION NOT FOUND IN THE COUNTY OF COOK.

_____ **(7) CERTIFIED MAIL**
      ***** COMPLETE THIS SECTION IF WRIT IS A THIRD PARTY CITATION/GARNISHMENT *****

_____ **(8)**    AND BY MAILING ON THE _____ DAY OF _____ 20____ A COPY OF THE THIRD PARTY GARNISHMENT/CITATION SUMMONS AND NOTICE TO THE JUDGMENT DEBTOR'S LAST KNOWN ADDRESS AS INDICATED IN THE NOTICE WITHIN (2) BUSINESS DAYS OF SERVICE UPON GARNISHEE/THIRD PARTY DEFENDANT.

**THE NAMED DEFENDANT WAS NOT SERVED FOR THE GIVEN REASON BELOW:**

| | | |
|---|---|---|
| _____ (01) NO CONTACT | _____ (05) WRONG ADDRESS | _____ (09) DECEASED |
| _____ (02) MOVED | _____ (06) NO SUCH ADDRESSS | _____ (10) NO REGISTERED AGENT |
| _____ (03) EMPTY LOT | _____ (07) EMPLOYER REFUSAL | _____ (11) OUT OF COOK COUNTY |
| _____ (04) NOT LISTED | _____ (08) CANCELLED BY PLAINTIFF ATTY | _____ (12) OTHER REASON (EXPLAIN) |

EXPLANATION: *INTAKE SPECIALIST*

ATTEMPTED SERVICES

WRIT SERVED ON: *MS Hightower AL*     DATE     TIME(AM/PM) *0730A*     STAR # *10061*

SEX: M/*F*   RACE:*B*   AGE:*50*

THIS *21* DAY OF *SEP*, 20*16*

Thomas J. Dart

SHERIFF, BY: _____ DEPUTY

SSC640

*PALOMINO #10061*



## SHERIFF'S OFFICE OF COOK COUNTY, ILLINOIS
## AFFIDAVIT OF SERVICE



\* 0 2 2 1 4 3 0 1 \*

CASE NUMBER: 16CH12154      MULT.SER. 1      DOC. TYPE: CHANCERY

**DIE DATE: 10/07/2016**     RECEIVED DATE: 9/15/2016     FILED DATE: 09/14/2016     DIST: 604 DC
12:00:00 PM

| DEFENDANT | PLANTIFF |
|---|---|
| NASDAQ PHLX LLC | CITADEL SECURITIES LLC |
| 208 S LASALLE ST | **ATTORNEY** |
| CHICAGO, IL 60604 | FOLEY & LARDNER |
| STE 814 | 321 N CLARK #2800 |
| | CHICAGO, IL 60654 |
| | (312) 832-4500 |

FILED
CH - 2408
SEP 27 2016
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**ATTACHED FEE AMOUNT:**

**SERVICE INFORMATION:**     CT CORP

**I CERTIFY THAT I SERVED THE DEFENDANT/RESPONDENT AS FOLLOWS:**

\_\_\_\_\_ **(1) PERSONAL SERVICE:**
BY LEAVING A COPY OF THE WRIT/ORDER WITH THE DEFENDANT/RESPONDENT PERSONALLY, AND INFORMING DEFENDANT/RESPONDENT OF CONTENTS.

\_\_\_\_\_ **(2) SUBSTITUTE SERVICE:**
BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT AT THE DEFENDANT'S USUAL PLACE OF ABODE WITH A FAMILY MEMBER OR PERSON RESIDING THERE, 13 YEARS OR OLDER, AND INFORMING THAT PERSON OF THE CONTENTS OF THE SUMMONS. ALSO, A COPY OF THE SUMMONS WAS MAILED TO THE DEFENDANT AT HIS OR HER USUAL PLACE OF ABODE ON THE _____ DAY OF _____ 20\_\_\_\_\_

\_\_\_\_\_ **(3) UNKNOWN OCCUPANTS:**
BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT NAMING "UNKNOWN OCCUPANTS" WITH A PERSON OF THE AGE OF 13 OR UPWARDS OCCUPYING SAID PREMISE.

X\_\_\_\_ **(4) CORP/CO/BUS/PART:**
BY LEAVING THE APPROPRIATE NUMBER OF COPIES OF THE SUMMONS, COMPLAINTS, INTERROGATORIES, JUDGMENTS, CERTIFICATIONS AND NOTICES WITH THE REGISTERED AGENT, AUTHORIZED PERSON OR PARTNER OF THE DEFENDANT CORPORATION \_\_\_\_ COMPANY \_\_\_\_ BUSINESS \_\_\_\_ PARTNERSHIP \_\_\_\_

\_\_\_\_\_ **(5) PROPERTY RECOVERED:**
NO ONE PRESENT TO RECEIVE ORDER OF COURT. ORDER POSTED IN PLAIN VIEW.

\_\_\_\_\_ **(6) S.O.S./D.O.I.:**
BY LEAVING THE SUMMONS AND COMPLAINT WITH THE SECRETARY OF THE STATE/DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, AN AGENT OF SAID DEFENDANT LISTED ABOVE. ANY AGENT OF SAID CORPORATION NOT FOUND IN THE COUNTY OF COOK.

\_\_\_\_\_ **(7) CERTIFIED MAIL**
***** COMPLETE THIS SECTION IF WRIT IS A THIRD PARTY CITATION/GARNISHMENT *****

\_\_\_\_\_ **(8)**     AND BY MAILING ON THE \_\_\_\_\_ DAY OF _____ 20\_\_\_\_\_ A COPY OF THE THIRD PARTY GARNISHMENT/CITATION SUMMONS AND NOTICE TO THE JUDGMENT DEBTOR'S LAST KNOWN ADDRESS AS INDICATED IN THE NOTICE WITHIN (2) BUSINESS DAYS OF SERVICE UPON GARNISHEE/THIRD PARTY DEFENDANT.

**THE NAMED DEFENDANT WAS NOT SERVED FOR THE GIVEN REASON BELOW:**

| | | |
|---|---|---|
| \_\_\_\_\_ (01) NO CONTACT | \_\_\_\_\_ (05) WRONG ADDRESS | \_\_\_\_\_ (09) DECEASED |
| \_\_\_\_\_ (02) MOVED | \_\_\_\_\_ (06) NO SUCH ADDRESSS | \_\_\_\_\_ (10) NO REGISTERED AGENT |
| \_\_\_\_\_ (03) EMPTY LOT | \_\_\_\_\_ (07) EMPLOYER REFUSAL | \_\_\_\_\_ (11) OUT OF COOK COUNTY |
| \_\_\_\_\_ (04) NOT LISTED | \_\_\_\_\_ (08) CANCELLED BY PLAINTIFF ATTY | \_\_\_\_\_ (12) OTHER REASON (EXPLAIN) |

EXPLANATION: _INTAKE SPECIALIST_

ATTEMPTED SERVICES

WRIT SERVED ON: _MS Hightower AL_     DATE     TIME (AM/PM)     STAR #

SEX: M/_B_    RACE: _B_    AGE: _50_     _0730A_    _10061_

THIS _21_ DAY OF _Sept_, 20_16_

Thomas J. Dart

SHERIFF, BY: _____ , DEPUTY

SSC640

_PALOMINO #10061_

Chancery Division Civil Cover Sheet - General Chancery Section          (Rev. 12/30/15) CCCH 0623

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| Citadel Securities LLC, et al., | 2016CH12154 CALENDAR/ROOM 10 TIME 00:00 Declaratory Jdgmt |
| Plaintiff | |
| v. | No. _____ |
| Chicago Board Options Exchange, Inc., et al., | |
| Defendant | |

## CHANCERY DIVISION CIVIL COVER SHEET
## GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

0005 ☐ Administrative Review
0001 ☐ Class Action
0002 ■ Declaratory Judgment
0004 ☐ Injunction

0007 ☐ General Chancery
0010 ☐ Accounting
0011 ☐ Arbitration
0012 ☐ Certiorari
0013 ☐ Dissolution of Corporation
0014 ☐ Dissolution of Partnership
0015 ☐ Equitable Lien
0016 ☐ Interpleader
0017 ☐ Mandamus
0018 ☐ Ne Exeat

0019 ☐ Partition
0020 ☐ Quiet Title
0021 ☐ Quo Warranto
0022 ☐ Redemption Rights
0023 ☐ Reformation of a Contract
0024 ☐ Rescission of a Contract
0025 ☐ Specific Performance
0026 ☐ Trust Construction
     ☐ Other (specify) _____

2016 SEP 14 PM 4:09
CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
CHANCERY DIV.
DOROTHY BROWN
CLERK

By: Ellen Wheeler
■ Atty. No.: 17190          ☐ Pro Se 99500
Name: Foley & Lardner LLP
Atty. for: Plaintiffs
Address: 321 North Clark Street, Suite 2800
City/State/Zip Code: Chicago, Illinois 60654-5313
Telephone: 312.832.4500
Primary Email Address:
ewheeler@foley.com
Secondary Email Address(es):
sbedell@foley.com; tkrebs@foley.com; jbritt@foley.com

Pro Se Only: ☐ I have read and agree to the terms of the Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

_____

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
Page 1 of 1

```
CLERK OF THE CIRCUIT COURT - COOK COUNTY
00193831 Chancery-01 9/14/2016 3:44PM
ATTY#37180    D23 BHUNIKA

COURT DATE: 0/00/0000 12:00AM
CASE TOTAL: $359.00
                                            $240.00
Base Filing Fee 6                            $25.00
Document Storage
Automation                                   $25.00
Law Library                                  $21.00
Arbitration                                  $10.00
Dispute Resolution                            $1.00
Court Services                               $25.00
Children Waiting Rm                          $10.00
Access Justice Fund                           $2.00
CHECK NO: 1434234
CHECK AMOUNT:                               $359.00
CHANGE
                                             $0.00

RECEIPT 0001 OF 0001
TRANSACTION TOTAL:
                                           $359.00

         THANK YOU
```

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| Citadel Securities LLC, Ronin Capital, LLC, Susquehanna Securities and Susquehanna Investment Group, | ) ) ) ) | 2016CH12154 CALENDAR/ROOM 10 TIME 00:00 Declaratory Jdgmt |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No. |
| Chicago Board Options Exchange, Inc., International Securities Exchange, LLC, NASDAQ PHLX LLC (f/k/a Philadelphia Stock Exchange, Inc.), NYSE Arca, Inc. (f/k/a Pacific Exchange, Inc.), NYSE MKT LLC (f/k/a NYSE Amex LLC, f/k/a American Stock Exchange LLC), | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiffs Citadel Securities LLC ("Citadel"), Ronin Capital, LLC ("Ronin"), Susquehanna Investment Group ("Susquehanna Group") and Susquehanna Securities ("Susquehanna Securities") (collectively, the "Market Makers") complain against Defendants Chicago Board Options Exchange, Inc. ("CBOE"), International Securities Exchange, LLC ("ISE"), NASDAQ PHLX LLC (f/k/a Philadelphia Stock Exchange, Inc.) ("PHLX"), NYSE Arca, Inc. (f/k/a Pacific Exchange, Inc.) ("NYSE Arca"), NYSE MKT LLC (f/k/a NYSE Amex LLC, f/k/a American Stock Exchange LLC) ("AMEX") (collectively, the "Exchanges") as follows:

## NATURE OF THE ACTION

1.      This action presents a remarkable situation.  In this case, there is no dispute that the Exchanges improperly charged fees to the Market Makers on millions of orders over a period

4830-0893-8293

of approximately ten years. Rather, the dispute arises from the Exchanges' assertion that they are not responsible for these mischarges, and thus are free from liability under the law in connection therewith.

2.      Pursuant to Exchanged-administered payment for order flow programs ("PFOF Programs"), the Market Makers were assessed marketing fees whenever they traded as contra-parties against customer orders ("PFOF Marketing Fees"). With limited exception, trades against proprietary or market-maker orders did not require the payment of PFOF Marketing Fees. For at least a ten-year period, however, multiple Exchange member firms submitted to the Exchanges millions of orders for their proprietary and market maker accounts that were misidentified as customer orders.

3.      The Market Makers who traded against these miscoded orders were wrongly charged PFOF Marketing Fees by the Exchanges.

4.      The fact that the Exchanges mischarged the Market Makers potentially millions of dollars of PFOF Marketing Fees became known in late 2012, when each of the Exchanges announced that it had taken disciplinary action against Goldman Sachs & Co. ("Goldman") resulting in a $6,750,000 fine.

5.      Almost three years later, the Exchanges announced that they had taken similar action against Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), resulting in a penalty of $9,000,000.

6.      In a letter dated February 6, 2013, which was formally submitted to each of the Exchanges, the Market Makers requested a full accounting and reimbursement of improperly charged PFOF Marketing Fees. After receiving no response to the February 6 letter, the Market

4830-0893-8293

Makers sent follow-up letters, dated February 22, 2013 and March 4, 2013, to each of the Exchanges.

7.     On March 5, 2013, after conferring with each other, the Exchanges finally responded, denying any responsibility for mischarging PFOF Marketing Fees and refusing to provide the requested accounting or reimbursement. The Exchanges did not, however, deny that the PFOF Marketing Fees were wrongly charged for non-customer orders.

8.     The Exchanges provided no adjudicative process and offered no administrative procedure to appeal their decision. The Market Makers sued the Exchanges, but the Exchanges took the position that the Market Makers were required to exhaust administrative remedies. The Market Makers, therefore, filed a Petition for Administrative Remedy with the U.S. Securities and Exchange Commission (the "SEC"). The SEC decided that it did *not* have jurisdiction to hear what it described as "in effect, a billing dispute" taking place "by and between private parties." Securities Exchange Act of 1934 Release No. 78340 (July 15, 2016) (Opinion and Order Dismissing Petition for Administrative Remedy).[1]

9.     Here, the Market Makers do not seek to enforce compliance with any Exchange rule or fee schedule. Rather, the Market Makers seek a declaratory judgment holding that (a) the Exchanges cannot charge PFOF Marketing Fees on orders that are not part of the Exchanges' PFOF Programs, (b) the Exchanges are liable for charging PFOF Marketing Fees on orders that are not part of or subject to the Exchanges' PFOF Programs, and (c) the Exchanges are required to reimburse the improperly charged PFOF Marketing Fees to the Market Makers. The Market Makers also seek an accounting to determine the amount due to them as a result of the inappropriate assessment of PFOF Marketing Fees on orders that were not part of the PFOF

---

[1] A copy of the SEC's Opinion and Order Dismissing Petition for Administrative Remedy is attached hereto as Exhibit 1.

3

Programs, damages resulting from the Exchanges' breach of contract, and recovery or restitution of all PFOF Marketing Fees inappropriately charged by the Exchanges.

## PARTIES

### Plaintiffs

10.    Plaintiff Citadel is a Delaware limited liability company with its principal place of business located at 131 South Dearborn Street, Chicago, IL 60603. Citadel is and has been a member of CBOE since April 17, 2003, ISE since May 3, 2002, AMEX since March 12, 2004, NYSE Arca since March 23, 2004, and PHLX since December 23, 2003. As a member, market maker and specialist on the Exchanges, Citadel has paid the Exchanges millions of dollars in membership and other fees per year.

11.    Plaintiff Ronin is a Delaware limited liability company with its principal place of business located at 350 North Orleans Street, Suite 2N, Chicago, IL 60654. Ronin is and has been a member of CBOE since December 17, 2001 and NYSE Arca since February 26, 2005. Ronin became a member of the ISE on June 9, 2004 and terminated its membership on March 15, 2013. Ronin became a member of AMEX on November 5, 2010 and terminated its membership on August 31, 2012. Ronin became a member of PHLX on December 9, 2009 and terminated its membership on September 4, 2012. As a member, market maker and specialist on the Exchanges, Ronin has paid the Exchanges millions of dollars in membership and other fees per year.

12.    Plaintiff Susquehanna Group is a Pennsylvania general partnership with its principal place of business located at 401 E. City Avenue, Suite 220, Bala Cynwyd, PA 19004-1188. SIG also maintains an office at 175 W. Jackson Boulevard, Suite 1700, Chicago, IL 60604. SIG is and has been a member of CBOE since March 24, 1987, ISE since September 27,

4

2005, NYSE Arca since June 20, 2007, and PHLX since August 15, 1983. As a member and market maker on the Exchanges, SIG has paid the Exchanges millions of dollars in membership and other fees per year.

13.     Plaintiff Susquehanna Securities is a Delaware general partnership with its principal place of business located at 401 E. City Avenue, Suite 220, Bala Cynwyd, PA 19004-1188. Susquehanna Securities also maintains an office at 175 W. Jackson Boulevard, Suite 1700, Chicago, IL 60604. Susquehanna Securities is and has been a member of CBOE since April 4, 1994, AMEX since March 31, 1994, NYSE Arca since January 12, 2009, and PHLX since October 15, 1985. As a member and specialist on the Exchanges, Susquehanna Securities has paid the Exchanges millions of dollars in membership and other fees per year.

### Defendants

14.     Defendant CBOE, a for-profit Delaware corporation, operates the largest options exchange in the United States. CBOE is owned by CBOE Holdings, Inc., a public company. CBOE's principal place of business is located at 400 S LaSalle Street, Floor 1, Chicago, IL 60605.

15.     Defendant ISE, a for-profit New Jersey limited liability company, operates the first all-electronic options exchange in the United States. ISE's principal place of business is located at 60 Broad Street, Floor 26, New York, NY 10004. ISE transacts business within the State of Illinois, including by assessing membership and other fees on member firms located in the State of Illinois and disciplining member firms located in the State of Illinois.

16.     Defendant NYSE Arca, a for-profit Delaware corporation, operates an electronic options exchange. NYSE Arca is owned by NYSE Euronext, a public company. NYSE Arca's principal place of business is located at 100 S. Wacker Drive, Suite 1800, Chicago, IL 60606.

4830-0893-8293

17.     Defendant AMEX, a for-profit Delaware limited liability company, operates an options exchange. AMEX is owned by NYSE Euronext, a public company. AMEX's principal place of business is located at 11 Wall Street, New York, NY 10005. AMEX transacts business within the State of Illinois, including but not limited to assessing listing fees on public companies located in the State of Illinois, assessing membership and other fees on member firms located in the State of Illinois, performing examinations of member firms located in the State of Illinois, and disciplining member firms located in the State of Illinois.

18.     Defendant PHLX, a for-profit Delaware Limited Liability Company, operates an options exchange. PHLX is owned by The NASDAQ OMX Group, Inc., a public company. PHLX's principal place of business is located at 1900 Market Street, Philadelphia, PA 19103. PHLX transacts business within the State of Illinois, including but not limited to assessing membership and other fees on member firms located in the State of Illinois, performing examinations of member firms located in the State of Illinois, and disciplining member firms located in the State of Illinois.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this dispute pursuant to 735 ILCS 5/2-209 because each of the Exchanges transacts business within the State of Illinois, including but not limited to operating exchanges in the State of Illinois, assessing listing fees on public companies located in the State of Illinois, assessing membership and other fees on member firms located in the State of Illinois, performing examinations of member firms located in the State of Illinois, and disciplining member firms located in the State of Illinois. In addition, each Exchange has made and performed contracts and/or promises substantially connected to the State of Illinois.

6

20.    Venue in this Court is appropriate pursuant to 735 ILCS 5/2-101 because both CBOE and NYSE Arca reside in Cook County, Illinois and because this action arises out of conduct that took place at least in part in Cook County, Illinois.

## FACTS APPLICABLE TO ALL COUNTS

### Background Regarding the PFOF Programs

21.    Between 2004 and 2014 – the period of time during which the Exchanges determined that Goldman and Merrill Lynch miscoded firm and market-maker orders as customer orders – each Exchange operated  a PFOF Program.

22.    The PFOF Programs were marketing programs which served no regulatory or governmental purpose.  Rather, the private business purpose of each PFOF Program was to increase order flow to the applicable Exchange, thereby generating more revenue and, ultimately, more profits for that Exchange.

23.    In establishing, or re-establishing,[2] a PFOF Program, each Exchange drafted and submitted proposed fee schedule changes to the Commission.  In these proposals, each Exchange acknowledged that the purpose of its program was to attract order flow to that Exchange and thus enhance its competitive position.

    a.    AMEX's proposal reinstituting a PFOF Program states that "[t]he Amex believes that [other exchanges' payment for order flow] programs operate to the competitive disadvantage of the Amex" and that even though, such programs "create the appearance of serious conflicts of interest between the business objectives of the self-regulatory organization and its statutory duties, …the Amex believes it may be necessary to reinstitute its payment for order flow program in order to respond to these competitive pressures."  The notice further states that "[a]fter thorough consideration, the Exchange has determined to reinstate its marketing fee program in a modified form effective June 2, 2003. The revenue generated by these marketing fees would be used to compete for order flow in

---

[2] All of the Exchanges had PFOF Programs in place as of early 2001, but the CBOE, AMEX and PHLX suspended their programs in mid-2001.  NYSE Arca and ISE continued to operate their PFOF Programs and, in late 2002 and 2003, CBOE, AMEX and PHLX reinstated their PFOF Programs.

equity options listed for trading on the Exchange." Proposed Rule Change by the AMEX Relating to a Marketing Fee To Be Imposed on Certain Transactions of Specialists and Registered Options Traders, Exchange Act Release No. 34-48053, 68 Fed. Reg. 37,880 (June 25, 2003).

b.  CBOE's proposal reinstating its payment for order flow program states that "[t]he CBOE believes that [the other exchanges' payment for order flow] programs operate to the competitive disadvantage of the CBOE" and the "[t]he CBOE believes this marketing fee will serve to enhance the competitiveness of the CBOE and its members...." Proposed Rule Change by the Chicago Board Options Exchange, Inc. To Reinstate the Imposition of a Marketing Fee, Exchange Act Release No. 34-47948, 68 Fed. Reg. 33,749 (June 5, 2003). In a regulatory circular issued to its members announcing the reinstatement of a PFOF Program, the CBOE stated that its Board of Directors had determined to reinstitute the program "in recognition of the competitive forces within the options industry which require such a fee so that the Exchange can remain competitive."

c.  NYSE Arca's proposal establishing a PFOF Program states that "[t]he purpose of the proposed new fee is to provide a source of revenue to the Exchange to be used in response to changing competitive circumstances that have arisen and may continue to arise in particular multiply traded equity options issues. These circumstances include the growing practice by some traders on options exchanges of paying brokers for orders in multiply traded issues directed to them. In light of this development and in order to be competitive in multiply traded options, the PCX has determined to impose a new fee on market makers' transactions in designated equity option issues." Proposed Rule Change by the Pacific Exchange, Inc. Relating to a New Fee on Market Makers' Transactions in Designated Equity Option Issues, Exchange Act Release No. 34-43290, 65 Fed. Reg. 57,213 (Sept. 21, 2000).

d.  ISE's proposal implementing a PFOF Program states that "ISE believes that it must establish a level playing field on which it can compete with the other options exchanges, all of which have developed their own payment for order flow programs." Proposed Rule Change by ISE Relating to Payment for Order Flow, Exchange Act Release No. 34-43462, 65 Fed. Reg. 64,466 (October 19, 2000).

e.  PHLX's proposal reinstituting a PFOF Program states that "[t]he purpose of the proposed rule change is to generate a source of revenue that specialists may use to attract order flow to the Phlx, and to maintain and enhance the Phlx's competitive position." Proposed Rule Change by the PHLX Relating to Its Payment for Order Flow Program, Exchange Act Release No. 34-47090, 68 Fed. Reg. 141 (Jan. 2, 2003).

24.  The types of orders that are part of the PFOF Programs and the amount of PFOF Marketing Fees that an Exchange is entitled to charge are set forth in fee schedules.

8

25.    Pursuant to the fee schedules, the Exchanges assessed PFOF Marketing Fees on orders in amounts that varied during the relevant time period:

    a.    AMEX charged between $0.35 and $1.00 per contract.

    b.    CBOE charged between $0.22 and $0.65 per contract.

    c.    ISE charged between $0.10 and $0.65 per contract.

    d.    NYSE Arca charged between $0.45 and $1.00 per contract.

    e.    PHLX charged between $0.25 and $1.00 per contract.

26.    Not all orders were part of the PFOF Programs. Because the primary purpose of the PFOF Programs was to attract order flow from public customers to the Exchanges, customer orders generally were the only orders included in the PFOF Programs:

    a.    Only customer orders were part of AMEX's PFOF Program.

    b.    Only customer orders were part of CBOE's PFOF Program from May 2003 until December 12, 2005 and from August 1, 2009 through the end of the relevant time period. During the remaining portion of the relevant time period, certain orders submitted on behalf of broker-dealers and firm orders were part of CBOE's PFOF Program. At no time, however, were market-maker orders part of CBOE's PFOF Program.

    c.    Only customer orders were part of ISE's PFOF Program.

    d.    Only customer orders for equity options and, for a portion of the relevant time period, non-customer orders for certain exchange traded funds were part of NYSE Arca's PFOF Program. At no time were market-maker orders part of NYSE Arca's PFOF Program.

    e.    Only customer orders were part of PHLX's PFOF Program.

27.    No rule, regulation, or agreement allowed the Exchanges to charge PFOF Marketing Fees on orders that were not part of or eligible for the PFOF Program.

28.    During the relevant time period, as part of their private business operations and as a feature of the PFOF Programs, the Exchanges were responsible for tracking the orders sent by

4830-0893-8293

the order flow providers and subject to PFOF Marketing Fees, billing the specialists, collecting and maintaining the funds[3] and issuing payments to the order flow providers.

29. The Exchanges collected hundreds of millions of dollars in PFOF Marketing Fees during the relevant time period. For example, between 2004 and 2010, the CBOE alone collected a total of approximately $637 million in PFOF Marketing Fees as follows:

| Year | PFOF Marketing Fees collected[4] |
|-------|-----------------|
| 2004 | $14.1 million |
| 2005 | $42.1 million |
| 2006 | $96.5 million |
| 2007 | $125.0 million |
| 2008 | $131.9 million |
| 2009 | $126.2 million |
| 2010 | $101.3 million |
| Total | $637.1 million |

30. The Exchanges also collected transaction fees and other exchange fees on the increased order flow directed to the Exchanges as a result of the PFOF Programs. Unlike the PFOF Marketing Fees, these transaction fees were not paid to order flow providers, but rather constituted Exchange revenue. In this way, the PFOF Programs, by attracting order flow to the Exchanges, and thereby generating the associated transaction fees, increased Exchange revenue and profits. As noted, the primary purpose of the PFOF Programs was to increase order flow and thereby generate increased transactions fees.

---

[3] CBOE initially required that the specialists' clearing firms debit the appropriate amount of fees from the specialists' accounts and credit the accounts of the order flow providers. In November 2004, however, CBOE created a system whereby CBOE was responsible for maintaining the funds, keeping track of the number of orders submitted by order flow providers and subject to PFOF Marketing Fees, and making the necessary debits and credits to the accounts of the specialists and the order flow providers.

[4] This information was obtained from CBOE Holdings, Inc.'s annual reports for the years 2004-2010.

10

31.     PFOF Programs thus played an integral role in increasing the Exchanges' revenues.  According to annual reports filed by the Exchanges, transaction fees are the largest source of revenue for the Exchanges.

## The Exchanges' Findings Relating to Mismarking of Orders

32.     In the Fall of 2012, each of the Exchanges took disciplinary action against Goldman, finding that, during an approximately seven-year period, Goldman had miscoded vast numbers of non-customer orders as customer orders.[5]

33.     The Exchanges negotiated settlements with Goldman and ultimately accepted stipulations or letters of consent from Goldman that contained findings against Goldman and provided for Goldman to pay penalties as follows:

| Exchange | Date of Stipulation or Letter of Consent | Penalties |
|---|---|---|
| CBOE | September 20, 2012 | $3,750,000 |
| ISE | 2012[6] | $1,074,788 |
| NYSE Arca | September 20, 2012 | $671,305 |
| PHLX | October 10, 2012 | $448,459 |
| AMEX | September 20, 2012 | $443,700 |
| | TOTAL: | $6,388,252 |

34.     In addition, the Exchanges collected from Goldman the transaction fees it had previously avoided paying due to its order mismarking, in undisclosed amounts except for the $899,440 disclosed by the ISE.

35.     In its Decision Accepting Letter of Consent, the CBOE made an express finding that from approximately January 2004 through in or about May 2010, Goldman had marked

---

[5] Copies of the disciplinary actions are attached hereto as group Exhibit 2.

[6] ISE disclosed that it had accepted a Letter of Consent in its list of 2012 Final Disciplinary Actions as of December 31, 2012, but did not indicate the date of the Letter of Consent.

11

numerous options orders with an improper origin code. Specifically, Goldman had identified certain orders as originating from its customers when, in fact, they were not customer orders.

36. In the Summer of 2015, the Exchanges entered into similar settlements with Merrill Lynch, finding that from in or about 2004 through in or about 2014, Merrill Lynch marked and executed numerous options orders with an incorrect order origin code…"[7]

37. The Exchanges collectively sanctioned Merrill Lynch and assessed a penalty of $7,135,000, as follows:

| Exchange | Date of Stipulation or Letter of Consent | Penalties |
|---|---|---|
| CBOE | June 23, 2015 | $4,500,000 |
| ISE | 2015[8] | $1,350,000 |
| NYSE Arca | May 27, 2015 | $417,000 |
| PHLX | June 24, 2105 | $1,125,000 |
| AMEX | May 27, 2015 | $868,000 |
| | TOTAL: | $7,135,000 |

### Significance of the Exchanges' Findings

38. In their decisions accepting the stipulations and letters of consent, the Exchanges agreed and found that *all* market-maker orders and numerous broker-dealer orders and firm orders submitted by Goldman, and at least some market-maker and firm orders submitted by Merrill Lynch during the relevant time period, were improperly marked as orders submitted on behalf of customer orders.

39. Market-maker orders were never part of or eligible for the Exchanges' PFOF Programs or subject to the PFOF fee schedules. Likewise, firm orders and broker-dealer orders were not part of AMEX's, ISE's, NYSE Arca's (with the exception of certain orders for two

---

[7] Copies of these disciplinary actions are attached hereto as group Exhibit 3.

[8] ISE disclosed that it had accepted a Letter of Consent in its list of 2015 Final Disciplinary Actions as of December 31, 2015, but did not indicate the date of the Letter of Consent.

exchange traded funds) and PHLX's PFOF Programs. Broker-dealer orders and firm orders were also not part of CBOE's PFOF Program during portions of the relevant time period.

40.     The Market Makers traded against millions of orders submitted by Goldman and Merrill including orders that were mismarked as customer orders.

41.     The Exchanges wrongfully charged the Market Makers vast amounts of PFOF Marketing Fees on those mismarked orders that were not part of the PFOF Program and not subject to such fees.

42.     Despite their admissions that vast numbers of orders were mismarked as customer orders and that, as a result, the Exchanges improperly assessed and collected PFOF Marketing Fees from the Market Makers, the Exchanges have failed and, in fact, refused to provide an accounting of the improperly assessed fees or reimburse any of those fees to the Market Makers.

43.     Following the announcement of disciplinary action against Goldman, the Market Makers attempted to ascertain the magnitude of the financial impact of the miscoding of orders and to recover damages arising from the mischarged PFOF Marketing Fees.

44.     The Market Makers sent a letter, dated February 6, 2013, to the general counsel of each of the Exchanges, requesting a full accounting and reimbursement of improperly charged PFOF fees. After receiving no response, the Market Makers sent multiple follow-up letters.

45.     The Exchanges conferred and finally responded with a joint letter dated March 6, 2013, denying any responsibility for mischarging PFOF Marketing Fees and refusing to provide an accounting or reimbursement of the improperly charged PFOF Marketing Fees.

## COUNT I (DECLARATORY JUDGMENT)

46.     The Market Makers incorporate paragraphs 1 through 45 as if fully restated herein.

13

47. Each of the Market Makers are members of and serve as market makers or specialists on the Exchanges. As members, market makers and specialists, they have been and continue to be subject to numerous fees of various types, including but not limited to, PFOF Marketing Fees.

48. For a period of more than seven years, the Exchanges improperly charged the Market Makers PFOF Marketing Fees for orders that were not part of the Exchanges' PFOF Programs.

49. The Exchanges, however, have asserted that they are not responsible or liable for overcharging or wrongfully charging their members, such as the Market Makers, PFOF Marketing Fees.

50. An actual, justiciable dispute exists between the Market Makers and the Exchanges as to (a) whether the Exchanges are allowed to charge PFOF Marketing Fees on orders that are not part of or eligible for the Exchanges' PFOF Programs or subject to the PFOF fee schedules, (b) whether the Exchanges are liable for charging PFOF Fees on orders that are not part of or eligible for the Exchanges' PFOF Programs, and (c) whether the Exchanges are required to reimburse the improperly charged PFOF Marketing Fees to the Market Makers.

51. The Market Makers are entitled to a declaratory judgment that (a) the Exchanges cannot charge PFOF Marketing Fees on orders that are not part of or eligible for the Exchanges' PFOF Programs, (b) the Exchanges are liable for charging PFOF Marketing Fees on orders that are not part of or eligible for the Exchanges' PFOF Programs, and (c) the Exchanges are required to reimburse the improperly charged PFOF Marketing Fees plus interest to the Market Makers.

WHEREFORE, the Market Makers respectfully request that this Court enter a declaratory judgment stating that:

14

(a)     The Exchanges cannot charge PFOF Marketing Fees on orders that are not part of the Exchanges' PFOF Programs;

(b)     The Exchanges are liable for charging PFOF Marketing Fees on orders that are not part of the Exchanges' PFOF Programs; and

(c)     The Exchanges are required to reimburse the improperly charged PFOF Marketing Fees to the Market Makers plus interest.

## COUNT II (ACCOUNTING)

52.     The Market Makers incorporate paragraphs 1 through 45 as if fully restated herein.

53.     The amount of PFOF Marketing Fees improperly charged by the Exchanges to the Market Makers cannot be determined without an accounting.

54.     The Market Makers do not possess or have access to information regarding which orders were mismarked, which specialists or market makers executed those orders and the amount of PFOF Fees that were improperly charged to the Market Makers. Moreover, the Market Makers have no ability to obtain that information other than from the Exchanges which were responsible for administering the PFOF Programs, including identifying orders subject to PFOF Marketing Fees and administering the payment of fees.

55.     The Market Makers have requested that the Exchanges provide a full accounting of the PFOF Marketing Fees improperly charged by the Exchanges. Specifically, the Market Makers have requested that the Exchanges identify which orders were mismarked, which specialists or market makers executed those orders and the amount of PFOF Marketing Fees that were improperly charged to the Market Makers.

4830-0893-8293

56.     The Exchanges have refused to provide an accounting and have taken the position that they cannot be held liable or responsible if they overcharge fees and that they are entitled to (a) refuse to provide any information regarding the nature and amount of those overcharged fees and (b) conceal the extent to which they charged PFOF Marketing Fees on orders that were not part of the PFOF Programs.

57.     On information and belief, the PFOF Marketing Fees were collected in "pooled" accounts of a complex nature.

58.     Because of the complexity of the accounts and because the records concerning these accounts are in the Exchanges' possession, the Market Makers have no means of determining the amount of the fees that it was wrongly charged.

59.     The Market Makers have no adequate remedy at law that would provide for the relief requested.

WHEREFORE, the Market Makers hereby respectfully request the following relief:

a.      That this Court order the Exchanges to provide a full accounting of all PFOF Fees improperly charged to the Market Makers;

b.      That this Court order the Exchanges to identify, or account for, which orders were mismarked, which Market Maker executed those orders and the amount of PFOF Fees that were improperly charged to each Market Maker;

c.      That this Court award each Market Maker such amounts that are determined to be owed to it as a result of this accounting, including interest; and

d.      That this Court afford such other relief as is reasonable and just.

## COUNT III (BREACH OF CONTRACT)

60.     The Market Makers incorporate paragraphs 1 through 45 as if fully restated herein.

61.     The Exchanges' PFOF fee schedules constituted contracts between the Exchanges and the Market Makers. The fee schedules, in accordance with the terms and conditions of the PFOF Programs as defined in the Exchanges' own official regulatory circulars and rule-making submissions and the SEC's order approving the PFOF Programs and the PFOF fee schedules, and pursuant to their own express or implied terms, only applied the PFOF Marketing Fees to orders submitted on behalf of customers (and, in very limited circumstances, certain proprietary and broker dealer orders).

62.     The Market Makers performed their obligations arising from or related to the PFOF Programs and paid the required PFOF Marketing Fees in accordance with the fee schedules.

63.     By charging PFOF Marketing Fees on orders that were not properly part of or eligible for the Exchanges' PFOF Programs or subject to the Exchanges' PFOF fee schedules, the Exchanges violated the terms of the PFOF fee schedules and breached their contracts with the Market Makers.

64.     The Market Makers were damaged by the Exchange's breaches of contract in that they were charged PFOF Marketing Fees for a vast number of non-customer orders that were not, in fact, eligible for or part of the PFOF Programs or eligible for or subject to the PFOF fee schedules.

WHEREFORE, the Market Makers hereby request that this Court enter an order requiring the Exchanges to pay damages to the Market Makers in an amount which is expected to be in excess of $75,000, plus interest, and award such other relief as is reasonable and just.

4830-0893-8293

## COUNT IV (PROMISSORY ESTOPPEL)

65. The Market Makers incorporate paragraphs 1 through 45 as if fully restated herein.

66. The Exchanges' fee schedules constituted an unambiguous promise that only orders submitted on behalf of customers (and in very limited circumstances, certain proprietary and broker-dealer orders) would be part of or eligible for the PFOF Program and assessed PFOF Marketing Fees in accordance with the fee schedules.

67. Each Market Maker relied on the Exchanges' promise by participating in the PFOF Programs and by directing payments and/or allowing payments be made to order flow providers.

68. Each Market Maker's reliance was reasonable and foreseeable by the Exchanges.

69. Each Market Maker relied on the Exchanges' promises to its detriment in that it paid PFOF Marketing Fees for orders that were not subject to such fees.

WHEREFORE, the Market Makers hereby request that this Court enter an order requiring the Exchanges to reimburse each Market Maker all improperly charged PFOF Marketing Fees in an amount to be determined at trial which is expected to be in excess of $75,000, plus interest, and award such other relief as is reasonable and just.

## COUNT V (RESTITUTION)

70. The Market Makers incorporate paragraphs 1 through 45 as if fully restated herein.

71. The Market Makers have paid PFOF Marketing Fees to the Exchanges on orders not subject to or eligible for PFOF Marketing Fees or the PFOF Fee schedules.

18

72.     The Exchanges have failed and refused to reimburse or refund improperly charged PFOF Marketing Fees to the Market Makers.

73.     The Exchanges have unjustly benefited as a result of the improperly charged PFOF Marketing Fees.

WHEREFORE, the Market Makers respectfully request that this Court enter an order requiring the Exchanges to refund to the Market Makers all improperly charged PFOF Marketing Fees in an amount to be determined at trial which is expected to be in excess of $75,000, plus interest, and award such other relief as is reasonable and just.

## COUNT VI (RESCISSION)

74.     The Market Makers incorporate paragraphs 1 through 45 as if fully restated herein.

75.     On information and belief, the Exchanges mistakenly believed that the incorrectly marked orders submitted by the Subject Firm were part of the PFOF Programs.

76.     Due to their mistaken belief, the Exchanges misrepresented to the Market Makers that certain orders submitted by Goldman and Merrill Lynch were part of the PFOF Programs.

77.     The Market Makers paid PFOF Marketing Fees based on the mistaken belief that the orders being charged PFOF Fees were customer orders or otherwise part of the PFOF Programs.

78.     The Market Makers' mistaken belief as to the eligibility of the improperly charged orders was a material mistake and it occurred notwithstanding the exercise of due care by the Market Makers.

79.     Requiring the Market Makers to pay PFOF Marketing Fees on orders that were not part of the PFOF Programs is unconscionable.

19

80.     Rescission of the PFOF transactions and reimbursement of the PFOF Marketing

Fees plus interest will return the Market Makers to the status quo.

WHEREFORE, the Market Makers respectfully requests that this Court enter an

order requiring the Exchanges to rescind and refund to the Market Makers all improperly

charged PFOF Fees in an amount to be determined at trial which is expected to be in excess of

$75,000, plus interest, and award such other relief as is reasonable and just.

Date:  September 14, 2016                    Respectfully submitted,

Citadel Securities LLC, Ronin Capital, LLC,
Susquehanna Securities and Susquehanna
Investment Group

Stephen P. Bedell
Ellen M. Wheeler
Thomas P. Krebs                             By:_____
Jason P. Britt                                      One of Their Attorneys
Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone:  312.832.4500
Fax:  312.832.4700
sbedell@foley.com
ewheeler@foley.com
tkrebs@foley.com
jbritt@foley.com

4830-0893-8293

Exhibit 1

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 78340 / July 15, 2016

Admin. Proc. File No. 3-17189

| | |
|---|---|
| In the Matter of the Petition of<br><br>CITADEL SECURITIES LLC, RONIN CAPITAL, LLC, SUSQUEHANNA INVESTMENT GROUP, and SUSQUEHANNA SECURITIES | OPINION AND ORDER DISMISSING PETITION FOR ADMINISTRATIVE REMEDY |

Petition filed:        March 2, 2016
Last brief received:   April 22, 2016

    Citadel Securities LLC, Ronin Capital, LLC, Susquehanna Investment Group, and Susquehanna Securities (collectively, the "Market Makers") have filed a petition (the "Petition") requesting that we order the Chicago Board Options Exchange, Inc., International Securities Exchange, LLC, NASDAQ OMX PHLX, NYSE Arca, Inc., and NYSE MKT LLC (collectively, the "Exchanges") to pay damages to the Market Makers in an amount equal to marketing fees that, they claim, the Market Makers were improperly charged pursuant to the Exchanges' Payment for Order Flow ("PFOF") programs.[1] Alternatively, the Market Makers request that we order the Exchanges to disgorge the fees. As discussed below, we dismiss the Petition based on a lack of jurisdiction.

## I.    Background

    This matter concerns marketing fees (the "Marketing Fees") that the Exchanges assessed over several years in connection with their PFOF programs. According to the Market Makers,[2] although firm and market maker orders were generally not "eligible" for Marketing Fees,

---

[1]    "PFOF is an arrangement by which a broker receives payment from a market maker in exchange for sending order flow to them. These fees are imposed to attract order flow to a market, thereby increasing liquidity in that market." *Citadel Sec., LLC. v. Chicago Bd. Options Exch., Inc.*, 808 F.3d 694, 697 (7th Cir. 2015).

[2]    Petitioners "operate as 'market makers' under the exchanges' rules," and thus "compete for customer order flow by displaying buy and sell quotations for particular stocks." *Citadel*, 808 F.3d at 697.

The Market Makers identify no basis for Commission jurisdiction over the claims in this lawsuit against the Exchanges. Indeed, they expressly state that "[t]he Commission does not have jurisdiction over the Market Makers' Petition pursuant to its Rules of Practice" and that, as a result, "the Commission has no statutory authority to exercise jurisdiction over this matter."

---

3     The Market Makers assert that, "[b]ecause the primary purpose of the Exchange PFOF Programs was to attract order flow from public customers to the Exchanges, customer orders generally were the only orders included in the Exchange PFOF Programs." *See also Citadel*, 808 F.3d at 697 ("[T]hese [marketing] fees are not imposed for proprietary 'house trades,' where a firm trades on its own behalf.").

4     The suit was initially filed in the Circuit Court of Cook County, Illinois and subsequently removed to federal court.

5     *Citadel*, 808 F.3d at 700.

6     *Id.*

7     *Id.* at 700-01.

8     We subsequently directed the parties to file briefs addressing our jurisdiction to consider the Petition, which we considered in issuing this order. *See Citadel Sec. LLC*, Exchange Act Release No. 77501, 2016 WL 1272874, at *1 (Apr. 1, 2016).

3

The Market Makers request that, if "the Commission is unable or unwilling to provide" the requested relief, it "provide the Market Makers with a written denial of their request for administrative relief as soon as possible" so that they may preserve and pursue their judicial remedies.

The Exchanges, on the other hand, assert that we have jurisdiction under Exchange Act Section 19(h)(1), which authorizes us to institute proceedings to determine whether a self-regulatory organization ("SRO"), such as the Exchanges, "has violated . . . any provision of . . . its own rules" and to take appropriate remedial action in response.[9] They further argue that we may institute a proceeding based on an allegation of such a violation.[10]

The Seventh Circuit concluded that "the plain language of the Exchange Act calls for SEC review of plaintiffs' allegations of improper PFOF fees."[11] In this opinion we explain why: (1) Exchange Act Section 19(d) (and Rule of Practice 420), which permit an aggrieved person to seek review of an SRO decision that prohibits or limits access to services offered by the SRO or a member of it;[12] (2) Exchange Act Section 19(h)(1), which authorizes us to institute proceedings based on allegations that an SRO has violated its own rules;[13] and (3) the statutory provisions the Seventh Circuit referenced in its opinion do not authorize us to exercise jurisdiction over the Petition.

A.     **Prohibition or limitation of access under Exchange Act Section 19(d)**

4

101(a)(9)(iii) provides that a proceeding may be "initiated . . . by the filing, pursuant to Rule of Practice 420, of an application for review of [an SRO] determination."[15] Under Rule 420(a)(iii), an aggrieved person may file an application for review of an SRO's limitation or prohibition of access to services.[16] This rule implements Exchange Act Section 19(d).[17]

The Petition is not an application for review of an SRO determination under Section 19(d) or Rule 420. The Petition does not allege that the Exchanges have denied or limited the Market Makers' access to any service that the Exchanges offer.[18] Although the Petition alleges that the Market Makers traded on the Exchanges, the Market Makers do not allege that they were

---

[15]     17 C.F.R. § 201.101(a)(9)(iii). None of the other provisions of Rule 101(a)(9), which defines "proceeding," references a statutory or regulatory source of jurisdiction over the Petition. The Market Makers did not file "a petition for review of an initial decision by a hearing officer" under Rule 410; "a notice of intention to file a petition for review of a determination made pursuant to delegated authority" under Rule 430; "an application for review of a determination by the Public Company Accounting Oversight Board" under Rule 440; "an application for review of an action or failure to act in connection with the implementation or operation of any effective transaction reporting plan" under Regulation NMS, Rule 601(e), 17 C.F.R. § 242.601(e) (formerly 17 C.F.R. § 240.11Aa3-1(f)); "an application for review of an action taken or failure to act in connection with the implementation or operation of any effective national market system plan" under Regulation NMS, Rule 608(d), 17 C.F.R. § 242.608(d) (formerly 17 C.F.R. § 240.11Aa3-2(e)); or "an application for review of a determination of a registered securities information processor" under Exchange Act Section 11A(b)(5), 15 U.S.C. § 78k-1(b)(5). See 17 C.F.R. § 201.101(a)(9)(ii), (iv)-(viii).

[16]     17 C.F.R. § 201.420(a)(iii). Neither side suggests, and we conclude, that the Petition is not an application for review of any of the other types of SRO actions reviewable under Section 19(d).

[17]     See 15 U.S.C § 78s(d) (authorizing an aggrieved person to file an application for review of an SRO decision that "prohibits or limits any person in respect to access to services offered by such organization or member thereof"); see also Rules of Practice, Exchange Act Release No. 35833 (June 9, 1995), 60 Fed. Reg. 32,738, 32,775 (June 23, 1995) ("Rule 420 (a) and (b) are based in part on Exchange Act Section 19(d)(2), 15 U.S.C § 78s(d)(2).").

[18]     Indeed, the Market Makers do not seek relief under Rule 420 or Section 19(d) and expressly deny that the Rules of Practice authorize the relief they seek. We will not exercise jurisdiction on a basis the Market Makers disclaim. Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 809 n.6 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced.").

limited or prohibited access to those services.[19] Rather, the Petition alleges, in effect, a billing dispute, not a limitation or denial of access to the Exchanges' services.[20]

The Petition also alleges that the Exchanges failed to provide an accounting and a refund that the Market Makers requested from them after learning of the incorrect order coding, but this is not a limitation of access claim either. "In those cases in which we have found a denial of access, an SRO had denied or limited the applicant's ability to utilize one of the fundamentally

---

[19]     *Cf. Bloomberg, L.P.*, Exchange Act Release No. 49076, 57 SEC 265, 2004 WL 67566, at *2 (Jan. 14, 2004) (finding that NYSE's "imposition and enforcement of" certain restrictions relating to the dissemination of depth-of-book data "effected a denial of access to Bloomberg" of services because NYSE "would not provide Bloomberg access to [that] data unless it disseminated and continue[d] to disseminate" it in accordance with the restrictions); *Tower Trading, L.P.*, Exchange Act Release No. 47537, 56 SEC 270, 2003 WL 1339179, at *5 (Mar. 19, 2003) (concluding that "Tower's loss of its guaranteed participation fundamentally altered its access to services offered by CBOE"); *Scattered Corp.*, Exchange Act Release No. 37249, 52 SEC 812, 1996 WL 284622, at *2 (May 29, 1996) (finding that "the Exchange's determination not to process Scattered's application for registration as a market maker limits the firm's access to the CHX's services."); *William J. Higgins*, Exchange Act Release No. 24429, 48 SEC 713, 1987 WL 757509, at *5 (May 6, 1987) (concluding that "denial of a member's request to be permitted to communicate from the Exchange floor with non-members located off-floor would constitute a prohibition of, or limitation on, access to services").

[20]     "[N]ot every fee charged by an SRO will constitute a reviewable limitation on access." *Sec. Indus. & Fin. Mkts. Ass'n*, Exchange Act Release No. 72182, 2014 WL 1998525, at *8 (May 16, 2014). In *SIFMA*, an industry trade group challenged SRO rule changes affecting fees charged for non-core market data, claiming that they constituted limitations on access. We held there that the challenged fees could constitute such limitations—and provide a basis for Commission review—if, among other things, evidence showed that trade group members were aggrieved because "the level of the [resulting] prices charged . . . is so high as to be outside a reasonable range of fees under the Exchange Act." *Id.* at *8; *see also id.* at *7-9 (stating additional jurisdictional requirements, including with respect to associational standing). We held that the trade group needed to allege that the prices at issue were not merely too high but "contrary to the Exchange Act," *id.* at *9, and that the SRO services implicated in the application "were not merely important to the applicant but were central to the function of the SRO." *Id.* (citations omitted). The parties do not assert, nor do we find that the Petition, alleges these elements.

important services offered by the SRO."[21] "Such services must be 'central to the function of the SRO,' such as access to an exchange trading floor or registration as a market maker."[22] The Exchanges' refusal to provide the accounting and refund that the Market Makers seek is not a denial or limitation of access reviewable under that standard.

Second, the Petition seeks relief that is incongruous with, and exceeds our remedial authority to address, a claim of improper limitation or prohibition of access. When an SRO fails to justify a limitation or prohibition of access to services,[23] we must "set aside the action of the self-regulatory organization and require it to . . . grant [the applicant] access to services offered by the self-regulatory organization or member thereof."[24] We do not have authority to award

---

[21]  *Morgan Stanley & Co.*, Exchange Act Release No. 39459, 53 SEC 379, 1997 WL 802072, at *3 (Dec. 17, 1997); *see also Matthew Brian Proman*, Exchange Act Release No. 57740, 2008 WL 1902072, at *2 (Apr. 30, 2008) (finding that relevant standard was not satisfied when Proman failed to identify any services "'central to the function of the SRO,' such as access to an exchange trading floor or registration as a market maker" to which he had been denied access); *Sky Capital LLC*, Exchange Act Release No. 55828, 90 SEC 1942, 2007 WL 1559228, at *4 (May 30, 2007) (finding that *Morgan Stanley* test was not met when applicant failed to show that NASD "Office of the Ombudsman provide[d] a 'fundamentally important service' that [wa]s central to the function of NASD").

[22]  *Proman*, 2008 WL 1902072, at *2 (quoting *Morgan Stanley*, 1997 WL 802072, at *3); *see also Joseph Dillon & Co.*, Exchange Act Release No. 43523, 54 SEC 960, 2000 WL 1664016, at *3 (Nov. 6, 2000) ("The NASD's action also does not constitute a denial of membership or a denial of access to services. The operation of [NASD] Rule [of Conduct 3010(b)(2)] and the NASD's exemption denial have no bearing on Dillon's membership in the NASD, which continues unchanged whether or not an exemption is granted.").

[23]  A Section 19(d) prohibition or limitation of access claim is reviewed pursuant to the standard set forth in Section 19(f). We must set aside the prohibition or limitation unless we find that: "[1] that the specific grounds on which such . . . prohibition or limitation is based exist in fact, [2] that such . . . prohibition or limitation is in accordance with the rules of the self-regulatory organization, and [3] that such rules are, and were applied in a manner, consistent with the purposes of" the Exchange Act. 15 U.S.C. § 78s(f). We may also set aside a prohibition or limitation of access if we find that it "imposes any burden on competition not necessary or appropriate in furtherance of the purposes of" the Exchange Act. *Id.*

[24]  Exchange Act Section 19(f), 15 U.S.C. § 78s(f).

7

damages under Section 19(f).[25] As an alternative to damages, the Market Makers suggest we should create a "Fair Fund"—into which the Exchanges could pay the relevant Marketing Fees at issue, and from which the Market Makers could be compensated.[26] A Fair Fund may not be created in connection with a proceeding brought pursuant to Section 19(d). Our rules authorize a Fair Fund only when we have ordered the payment of both disgorgement and civil money penalties,[27] and those remedies are not available in a proceeding brought under Exchange Act Section 19(d).[28]

Third, even if the Petition were cognizable under Section 19(d), it would be untimely. "[A] party that chooses to appeal an SRO action pursuant to Section 19(d)(2) must file an application for review with the Commission within thirty days after receiving notice of the action."[29] The Market Makers identify no SRO action that took place within the 30 days before

---

[25]     *See MFS Sec. Corp.*, Exchange Act Release No. 47626, 2003 WL 1751581, at *6 n.33 (Apr. 3, 2003) ("MFS asks for damages, but we do not have the power to make such an award."), *aff'd*, 380 F.3d 611 (2d Cir. 2004); *Beatrice J. Feins*, Exchange Act Release No. 33374, 51 SEC 918, 1993 WL 538913, at *3 n.14 (Dec. 23, 1993) ("We are not authorized under statute to award damages . . . ."); *see also Marshall Fin., Inc.*, Exchange Act Release No. 50343, 57 SEC 869, 2004 WL 2026518, at *3 & n.21 (Sept. 10, 2004) ("Exchange Act Section 19 does not appear to authorize the setting aside of [the SRO's] Fees assessment or authorize 'remission' of the Fees.").

[26]     *See* Rule of Practice 1100, 17 C.F.R. § 201.1100 (authorizing the creation of Fair Funds in certain administrative proceedings); *see also* 15 U.S.C. § 7246(a) (authorizing "in any judicial or administrative action brought by the Commission under the securities laws" civil penalties to "be added to . . . a disgorgement fund or other fund established for the benefit of . . . victims").

[27]     *See* Rule of Practice 1100, 17 C.F.R. § 201.1100 (limiting scope of rule to "any agency process initiated by an order instituting proceedings in which the Commission or the hearing officer issues an order requiring the payment of disgorgement by a respondent and also assessing a civil money penalty against that respondent").

[28]     *See supra* text accompanying note 24.

[29]     *Orbixa Techs., Inc.*, Exchange Act Release No. 70893, 2013 WL 6044106, at *3 & n.12 (Nov. 15, 2013).

8

the Petition was filed,[30] and the Market Makers did not request any extension of time to file an application for review of any earlier SRO action.[31]

## B.    Disciplinary proceeding under Exchange Act Section 19(h)(1)

The Seventh Circuit concluded that Exchange Act Section 19(h)(1) provides the Commission with "jurisdiction [that] covers claims against an SRO for violating its own rules,"[32] and the Commission must therefore have jurisdiction over the claims raised by the Market Makers. But that provision, which authorizes us to institute proceedings against an exchange for rule violations, applies only when, "in [our] opinion" regulatory action against the exchange "is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes" of the Exchange Act.[33]

Section 19(h)(1) does not authorize claims by private parties against SROs. Unlike Section 19(d), which authorizes an aggrieved person to initiate an administrative review proceeding by filing an application for review,[34] Section 19(h)(1) exclusively authorizes "the appropriate regulatory authority," *i.e.*, the Commission, in its discretion, to commence an administrative disciplinary action against an SRO.[35] Were we to commence a litigated proceeding under Section 19(h)(1), that litigation would not be an adversarial proceeding between the Market Makers and the Exchanges. The parties to the proceeding would be the Exchanges and our Division of Enforcement, which would pursue claims against them, and the case initiating document would be our order instituting proceedings, not the Petition that the

---

[30]     The only SRO action mentioned in the papers is the March 5, 2013 statement denying responsibility for any losses that the Market Makers may have suffered as a result of improper order marking. The Market Makers did not challenge that action and do not ask us to construe the Petition as a challenge to the decision made nearly three years ago. Even if they did so, it is too late to challenge such a decision before the Commission.

[31]     *See Orbixa Techs.*, 2013 WL 6044106, at *3-4, *5 (dismissing application for review as untimely where it did not challenge any SRO action within 30 days of filing of the application or present "extraordinary circumstances" to extend filing deadline). Rule 420(b), which provides the "exclusive" procedure for seeking an extension of the filing deadline, mandates that an extension will be granted only on a showing of "extraordinary circumstances." No such showing was made here.

[32]     *Citadel*, 808 F.3d at 700 (quotations omitted).

[33]     15 U.S.C. § 78s(h)(1).

[34]     *See supra* notes 15-17 and accompanying text.

[35]     *See* 15 U.S.C. § 78s(h)(1); *cf. Marketlines, Inc. v. SEC*, 384 F.2d 264, 267 (2d Cir. 1967) ("In charging the Commission with the enforcement of the [Investment Advisers] Act 'in the public interest,' Congress necessarily gave it a broad discretion.") (citing *Berko v. SEC*, 316 F.2d 137, 141 (2d Cir. 1963) (same as to Securities Act)).

9

Market Makers have filed.[36] Thus, the Seventh Circuit's statement that that "the regulatory or private nature of the action does not determine the SEC's jurisdictional reach,"[37] does not comport with Section 19(h)(1), which does not provide for Commission jurisdiction over lawsuits initiated by and between private parties.

In any event, as the Seventh Circuit acknowledged, Section 19(h)(1) contains "no mention of damages or restitution."[38] That is precisely the remedy the Petition seeks and which the Commission may not provide the Market Makers. Section 19(h)(1) authorizes us, among other remedial action, only to suspend and/or impose limitations upon an SRO found in violation, not to award damages.[39]

## C.    Statutory provisions identified by the Seventh Circuit

### 1.    Availability to obtain "monetary compensation"

The Seventh Circuit suggested that the Market Makers' claims could be heard by the Commission because the "Exchange Act provides a range of administrative remedies for those aggrieved by an exchange's action," and "sections of the Exchange Act explicitly provide for monetary penalties."[40] In its view, through the Commission, "monetary compensation is at least

---

[36]    *Compare* Rule of Practice 200, 17 C.F.R. § 201.200 (governing initiation of proceedings by order instituting proceedings) with Rule 420, 17 C.F.R. § 201.420 (governing application for review filed to commence SRO review proceeding). Our Rules of Practice significantly limit the ability of third parties, such as the Market Makers would be, to participate in disciplinary proceedings, such as those under Section 19(h)(1). *See* Rule of Practice 210(a)(1), 17 C.F.R. § 201.210(a)(1) (providing that, subject to certain exceptions, "[n]o person shall be granted leave to become a party or a non-party participant on a limited basis in an enforcement or disciplinary proceeding").

[37]    *Citadel*, 808 F.3d at 700.

[38]    *Id.* at 701.

[39]    *See* 15 U.S.C. § 78s(h)(1) (authorizing, on an appropriate showing, the Commission "to suspend for a period not exceeding twelve months or revoke the registration of such self-regulatory organization, or to censure or impose limitations upon the activities, functions, and operations of" an SRO).

[40]    *Citadel*, 808 F.3d at 700-01.

10

a possibility."[41] That the Commission may impose civil penalties and seek disgorgement does not mean that we may provide "monetary compensation" to the Market Makers.[42]

The Court's opinion cited to Exchange Act Section 21B,[43] which authorizes us to impose civil money penalties in "any proceeding instituted pursuant to [Exchange Act] [S]ections 15(b)(4), 15(b)(6), 15D, 15B, 15C, 15E, or 17A."[44] The Petition does not initiate a proceeding under any of these provisions. Sections 15(b)(4) and (6) authorize the Commission to institute disciplinary proceedings against brokers and dealers and persons associated with them.[45] Sections 15D, 15B, 15C, 15E, and 17A address, respectively, matters relating to securities analysts and research reports;[46] municipal securities dealers and municipal advisors;[47] government securities brokers and dealers;[48] nationally recognized statistical rating organizations;[49] and the national system for clearance and settlement of securities transactions.[50] These provisions do not apply to the Market Makers and Exchanges' fee dispute.

Moreover, the civil money penalties that the Commission is authorized to seek under Section 21B are not damages. Damages are "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury."[51] "[C]ivil penalties go beyond compensation, are intended to punish, and label defendants wrongdoers."[52] Civil penalties also differ from

---

[41]    *Id.* at 701.

[42]    In *Sky Capital*, for example, the Petition asked that the "Commission award the firm at least $300 million in damages and penalties" for what it alleged was a "campaign of harassment" by the NASD. We noted there, as we do here, that "we do not have the authority to order such relief." 2007 WL 1559228, at *3 n.11.

[43]    15 U.S.C. § 78u-2.

[44]    15 U.S.C. § 78u-2(a)(1).

[45]    15 U.S.C. § 78o(b)(4) and (6).

[46]    15 U.S.C. § 78o-6.

[47]    15 U.S.C. § 78o-4.

[48]    15 U.S.C. § 78o-5.

[49]    15 U.S.C. § 78o-7.

[50]    15 U.S.C. § 78q-1.

[51]    *Black's Law Dictionary* (10th ed. 2014), *available at* Westlaw BLACKS.

[52]    *Gabelli v. SEC*, 133 S. Ct. 1216, 1218 (2013).

11

disgorgement, which "serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct" and "does not serve a punitive function."[53]

The Seventh Circuit also cited Exchange Act Section 21(d)(3), as "giv[ing] the [Commission] general authority to pursue monetary penalties in civil actions."[54] That provision, like Section 21B, applies only in a proceeding commenced by the Commission and does not authorize the award of damages.

### 2. Jurisdiction over rule challenges

Although SRO fee rules may be subject to challenge under Section 19(d), the Petition does not challenge the existence of the rules imposing the Marketing Fees. That the fees at issue were imposed pursuant to rules subject to Commission review does not make the Commission the arbiter of any and all disputes about such fees or rules.[55] A challenge to the implementation or application of a rule must fall within a grant of jurisdiction provided to the Commission under the Exchange Act. That the lawsuit involves a rule or SRO subject to Commission review does not automatically mean jurisdiction exists. "SRO action is not reviewable merely because it adversely affects the applicant."[56] As explained above, the Petition does not satisfy any of the bases under the Exchange Act for the Commission to exercise jurisdiction.[57]

---

[53]  *See SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). Unlike damages, which compensate injured parties for the harm they have suffered, disgorgement "deprives wrongdoers of the profits obtained from their violations." *See Zacharias v. SEC*, 569 F.3d 458, 472 (D.C. Cir. 2009).

[54]  *Citadel*, 808 F.3d at 701 (citing 15 U.S.C. § 78u(d)(3)).

[55]  *Citadel*, 808 F.3d at 699.

[56]  *Proman*, 2008 WL 1902072, at *2; *see also Morgan Stanley*, 1997 WL 802072, at *4 (finding that allegation that SRO action "had a negative impact on . . . firm's business" is not sufficient to establish Commission jurisdiction).

[57]  "Because we lack review jurisdiction, we do not consider the merits of [the Market Makers'] allegations of rule violations" by the Exchanges. *See Russell A. Simpson*, Exchange Act Release No. 40690, 53 SEC at 1048 n.13 (Nov. 19, 1998).

12

Accordingly, IT IS ORDERED that the Petition for Administrative Remedy of Citadel Securities LLC, Ronin Capital, LLC, Susquehanna Investment Group, and Susquehanna Securities is DISMISSED.[58]


By the Commission.


Brent J. Fields
Secretary


By: Jill M. Peterson
Assistant Secretary


---

[58]     We have considered all the arguments for and against jurisdiction advanced in the briefs. They are rejected or sustained to the extent that they are inconsistent or in accord with the views expressed herein. We express no view on the merits of the Market Makers' claims or whether those claims are cognizable in an action not before the Commission.

Exhibit 2

BEFORE THE BUSINESS CONDUCT COMMITTEE
OF THE
CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Goldman Sachs & Co. ) | File No. 12-0008 |
| 200 West Street ) | |
| New York, New York 10282 ) | |
| ) | |
| Subject ) | |

## DECISION ACCEPTING LETTER OF CONSENT

This proceeding was instituted by the Business Conduct Committee (the "Committee") of the Chicago Board Options Exchange, Incorporated (the "Exchange") as a result of an investigation by the staff of the Exchange. In order to resolve this matter, the subject, Goldman Sachs & Co. has submitted a Letter of Consent. Such Letter of Consent was submitted solely for the purposes of this proceeding without admitting or denying that a violation of Exchange Rules has been committed. With due regard to the stipulated facts and findings and the proposed sanction contained therein, the Committee believes it is appropriate to accept the Letter of Consent for File No. 12-0008 which is attached to and made a part of this Decision.

SO ORDERED
FOR THE COMMITTEE

Dated: September 20, 2012

By: /s/ Bruce Andrews
Bruce Andrews
Chairman
Business Conduct Committee

BEFORE THE BUSINESS CONDUCT COMMITTEE
OF THE
CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED

In the Matter of:       )
            )
Goldman, Sachs & Co.    )
200 West Street      )    File No. 12-0008
New York, New York 10282  )
            )
Subject         )
            )

## LETTER OF CONSENT

In order to resolve this proceeding pursuant to Chicago Board Options Exchange, Incorporated (the "Exchange" or "CBOE") Rule 17.3, Expedited Proceeding, the Subject, Goldman, Sachs & Co. ("Goldman Sachs"), hereby submits this Letter of Consent in the above-captioned matter. Only for purposes of this proceeding and without admitting or denying that a violation of Exchange Rules has been committed, Goldman Sachs consents to the Stipulation of Facts and Findings and Sanction set forth below.

Stipulation of Facts and Findings

1.  During all relevant periods herein, the Subject, Goldman Sachs was a member of the Exchange.

2.  During all relevant periods herein, Goldman Sachs was registered with the Exchange to transact business on the Exchange in accordance with Exchange Rules as a member organization associated with a market-maker and a floor broker, and a clearing member and an organization authorized to conduct a non-member customer business.

3.  During all relevant periods herein, Exchange Rules 4.1 – Just and Equitable Principles of Trade, 4.2 – Adherence to Law, 4.22 – Communications to the Exchange or the Clearing Corporation, 6.51 – Reporting Duties, 6.74 – Crossing Orders, 15.1 - Books and Records; and Section 17(a) of the Securities Exchange Act of 1934, as amended (the "Act") and Rule 17a-3 – Records to Be Made by Certain Exchange Members, Brokers and Dealers thereunder were in full force and effect.

4.  During all relevant periods herein, Goldman Sachs maintained several order entry systems, including the G2 and Stride order entry systems. The G2 order entry system was implemented in 2004 and was designed to handle simple options orders. The Stride order entry system was implemented in 2008 and was designed to handle complex options orders.

5.  During all relevant periods herein, the G2 order entry system was deficient in that, among other things, the order entry system did not have the functionality to enable the users to select from all potentially applicable order origin codes. Specifically, the G2 order entry system did not include a market maker (M) order origin code. In addition, the G2 order entry system defaulted automatically to the Customer (C) origin code in the event a user did not select an origin code.

File No. 12-0008

6.   During all relevant periods herein, the Stride order entry system was deficient in that, among other things, this order entry system was programmed to code all orders with a C origin code. Additionally, the Stride order entry system did not have the functionality for the user to select a specific origin code.

7.   During the approximate period from in or about January 2004 through in or about May 2010, Goldman Sachs, as a result of the deficiencies in the order entry systems described in Paragraphs 5 and 6 above, marked numerous options orders with an improper origin code resulting in the execution of orders and crosses, some of which may have been afforded priority to which they were not entitled.

8.   During the approximate period from in or about January 2004 through in or about May 2010, Goldman Sachs failed to maintain supervisory systems and controls that were reasonably designed to achieve compliance with Exchange rules relating to order entry and the conduct described in Paragraphs 5, 6 and 7 above, in that Goldman Sachs did not: (i) provide adequate training to its employees in the use of proper order origin codes at CBOE, and other exchanges; (ii) properly supervise the development of its order entry systems described in Paragraphs 5, 6 and 7 above; and (iii) respond to certain "red flags" relating to the proper coding of origin codes on orders routed to the options exchanges, in that despite the identification of several of the issues identified above on several occasions by employees of the firm, the firm failed to remediate its coding deficiencies until after the review period.

9.   The acts, practices and conduct described in Paragraph 7 above constitute violations of Exchange Rules 4.1, 4.2, 4.22, 6.51, 6.74, 15.1 and Section 17(a) of the Act and Rule 17a-3 by Goldman Sachs, in that Goldman Sachs, as a result of the deficiencies in the order entry systems described in Paragraphs 5, 6 and 7 above, marked numerous options orders with an improper origin code resulting in the execution of orders and crosses , some of which may have been afforded priority to which they were not entitled.

10.  The acts, practices and conduct described in Paragraph 8 above constitute a violation of Exchange Rule 4.2 by Goldman Sachs, in that Goldman Sachs failed to maintain supervisory systems and controls that were reasonably designed to achieve compliance with Exchange rules relating to order entry and the conduct described in Paragraphs 5, 6 and 7 above, in that Goldman Sachs did not: (i) provide adequate training to its employees in the use of proper order origin codes at CBOE, and other exchanges; (ii) properly supervise the development of its order entry systems described in Paragraphs 5, 6 and 7 above; and (iii) respond to certain "red flags" relating to the proper coding of origin codes on orders routed to the options exchanges, in that despite the identification of several of the issues identified above on several occasions by employees of the firm, the firm failed to remediate its coding deficiencies until after the review period.

Sanction:   A censure and a total fine imposed by CBOE and the seven options exchanges identified below in the amount of $6,750,000, of which $3,750,000 shall be paid to CBOE

In accepting the Letter of Consent, the Committee considered: (i) the significant subsequent remedial measures implemented by Goldman Sachs, including systems enhancements in its systems for options order flow and the development and delivery of training concerning options origin codes for users of the aforementioned systems; (ii) that Goldman Sachs

File No. 12-0008

separately paid to the Exchange the shortfall in transactions fees ("Fee Payment") associated with the miscoding described in Paragraph 7 above[1]; and (iii) the cooperation of Goldman Sachs throughout the CBOE's investigation.

This Letter of Consent is conditioned upon acceptance of substantially equivalent settlement agreements in related matters between Goldman Sachs and the following options exchanges: BATS Exchange, Inc. ("BATS"); Boston Options Exchange Regulation, LLC ("BOXR"); International Securities Exchange, LLC ("ISE"); The NASDAQ Options Market ("NOM"); NASDAQ OMX PHLX, Inc. ("PHLX"); NYSE Amex LLC ("AMEX"); and NYSE Arca, Inc. ("ARCA").

Subject acknowledges that it has read the foregoing Letter of Consent, that no promise or inducement of any kind has been made to it by the Exchange or its staff, and that this Letter of Consent is voluntary on its part.

Subject understands and acknowledges that the Committee's decision in this matter will become part of its disciplinary record and may be considered in any future Exchange proceeding.

Subject also acknowledges that the Committee's decision to accept or reject this Letter of Consent is final, and that it may not seek review thereof in accordance with Exchange Rule 17.3.

Dated: **June 26, 2012**      By: **/s/ Goldman, Sachs & Co.**
                              Goldman, Sachs & Co.

---

[1] This Fee Payment fully satisfied all transactions fees associated with the conduct described above.

# NYSE MKT LLC

**HEARING BOARD DECISION**  **September 20, 2012**
**12-NYSEMKT-6**

GOLDMAN, SACHS & CO.  FINRA Proceeding No. 20100235041-01
MEMBER ORGANIZATION

* * *

>Violated: (1) NYSE Amex Rules 16, 324, 956NY(a) and Section 17(a) of the Securities Exchange Act of 1934 and Rule 17a-3 promulgated thereunder, by mismarking options orders on the Exchange as "customer" through various proprietary order entry systems employed by Goldman, Sachs & Co. to send options orders to the Exchange; and (2) NYSE Amex Rule 320, by failing to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements. Consent to censure and a $443,700 fine.

### Appearances

For FINRA Market Regulation – Legal:

Eric S. Brown, Esq.
David E. Rosenstein, Esq.
Robert A. Marchman, Esq.

For Goldman, Sachs & Co.:

James D. Van De Graaff, Esq.
Beth A. Stekler, Esq.
David Markowitz, Esq.

* * *

A Hearing Officer at the Financial Industry Regulatory Authority ("FINRA") considered a Stipulation of Facts and Consent to Penalty entered into between the Legal Section of the Market Regulation Department at FINRA ("Market Regulation") on behalf of NYSE Regulation, Inc.[1] and Respondent Goldman, Sachs & Co. ("Goldman"), a member organization of the NYSE MKT LLC ("NYSE MKT") and its predecessor, NYSE Amex LLC ("NYSE Amex" or the "Exchange").[2]

---

[1] FINRA is handling this matter on behalf of NYSE Regulation and NYSE MKT pursuant to a Regulatory Services Agreement among NYSE Group, Inc., New York Stock Exchange LLC, NYSE Arca, Inc., NYSE Amex, NYSE Regulation, and FINRA, which became effective June 14, 2010.

[2] NYSE Amex LLC changed its name to NYSE MKT effective May 14, 2012. Because the conduct at issue occurred before May 14, 2012, this Decision refers to the NYSE Amex Equities Rules that were in effect during the period referenced in the Stipulation of Facts and Consent to Penalty.

Without admitting or denying guilt, Goldman consented to a finding by a Hearing Officer that it:

I.  Violated NYSE Amex Rules 16, 324, 956NY(a) and Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 17a-3 promulgated thereunder, by mismarking options orders on the Exchange as "customer" through various proprietary order entry systems employed by Goldman to send options orders to the Exchange.

II. Violated NYSE Amex Rule 320 by failing to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements, in that Goldman failed to: (i) reasonably address origin code requirements in the development and programming of its systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train its employees with respect to the significance of properly marking origin codes in its order entry systems; (iv) adequately supervise its employees with respect to the proper marking of origin codes; and (v) adequately respond to a number of "red flags" relating to the proper coding of origin codes on orders routed to the options exchanges.

For the sole purpose of settling this disciplinary proceeding, without adjudication of any issues of law or fact, and without admitting or denying any allegations or findings referred to in the Stipulation of Facts and Consent to Penalty, Goldman stipulated to the following facts:[3]

## BACKGROUND AND JURISDICTION

1.  Goldman is registered with the Securities and Exchange Commission and is a member organization of NYSE MKT (formerly NYSE Amex). Goldman is a global investment banking, securities, and investment management firm that, among other things, trades securities for institutional and individual customers.

2.  In August 2010, Goldman notified NYSE Regulation, through FINRA, that its systems had been preventing Goldman from properly marking many of its options orders on NYSE Amex.

---

[3] The facts, allegations, and conclusions contained in paragraphs 1 to 13 are taken from the Stipulation of Facts and Consent to Penalty. The Stipulation of Facts and Consent to Penalty is conditioned upon acceptance of parallel settlement agreements in related matters between Goldman and the following options exchanges: (i) the Chicago Board Options Exchange, Inc.; (ii) BATS Exchange, Inc.; (iii) Boston Options Exchange LLC (BOX became a facility of NASDAQ OMX BX in August 2008); (iv) The NASDAQ Options Market; (v) NASDAQ OMX PHLX, Inc.; (vi) International Securities Exchange, LLC; and (vii) NYSE Arca, Inc. The Stipulation of Facts and Consent to Penalty provides for an aggregate fine of $6,750,000.

## Overview

3.    In the course of responding to a routine regulatory inquiry, Goldman became aware of system issues that affected the origin code of option orders entered and executed through Goldman's order entry and routing systems to all options exchanges, including NYSE Amex. Upon being informed of these issues, and on behalf of NYSE Regulation, FINRA staff (the "Staff") conducted a review of Goldman's order entry activities during the period between January 2004 and June 2011 (the "Review Period") for compliance with Exchange rules, including NYSE Amex Rules 16, 320, 324, and 956NY(a), and Section 17(a) of the Exchange Act, as amended, and Rule 17a-3 promulgated thereunder.

4.    Applicable Exchange rules require that, when accepting an order, a member must obtain and record an appropriate code to identify the origin of the order (e.g., customer, broker-dealer, market maker). Such order origin codes are important because, among other things, they affect the accuracy of the Exchange's audit trail and may impact priority of execution and the amount of execution fees due to certain options exchanges.

5.    As a result of its investigation, the Staff concluded that during the Review Period, Goldman improperly marked certain options orders on behalf of broker-dealers and market makers as "customer" through various proprietary order entry systems employed by Goldman to send options orders to the Exchange, resulting in: (i) an inaccurate audit trail; (ii) the potential that, in certain situations, orders and quotations were not properly prioritized and matched, given that orders marked as "customer" had priority over other order types; and (iii) an underpayment of execution fees that would have been remitted to the Exchange had the orders in question been routed using the correct options origin code. Additionally, the Staff concluded that Goldman had supervisory deficiencies related to these matters, which are outlined in detail herein.

## Marking of Options Orders

6.    During the Review Period, Goldman and its affiliate, Goldman Sachs Execution & Clearing, L.P. ("GSEC"), maintained multiple proprietary order entry systems for listed options, including G2, Stride, and REDI. The G2 system, implemented in 2004, was designed to handle simple options orders. The Stride system, implemented in 2008, was designed to handle complex options orders. The REDI system, GSEC's direct market access system, was used by GSEC clients to directly enter orders that would be routed to certain exchanges, including NYSE Amex.

7.    During the Review Period, the G2 order entry system was deficient in that, among other things, it only allowed options orders to be coded as "firm," "broker-dealer," or "customer," without including functionality that would enable the selection of orders as "market maker," and defaulted to the "customer" origin code if no origin code category had been explicitly selected by Goldman's sales traders or others entering an order.

8.    During the Review Period, the Stride order entry system was deficient in that, among other things, it had been programmed to code all orders as "customer," without any functionality for Goldman's sales traders or others to select an origin code.

3

9. Insufficient coordination and inadequate communication among the different groups involved in the development of the G2 and Stride systems, including Compliance, Equity Derivative Sales, and Sales Technology, as well as a lack of awareness of the significance of options order origin code regulatory requirements and an inadequate understanding of Goldman's client base for its listed options business among the system developers, contributed to the creation of the deficiencies in the order entry systems previously referenced.

10. As a result of the deficiencies in Goldman's order entry systems described in paragraphs six through eight above, Goldman marked numerous options orders with improper origin codes, resulting in the execution of transactions, some of which may have been afforded priority to which they were not entitled and thereby potentially adversely impacted the execution and/or price of orders of other market participants. In the case of G2 and Stride, the improper marking of these options orders prevented the Exchange from receiving proper execution fees from Goldman, as "Customer" orders sent to the Exchange are charged a lower execution rate than other orders. Finally, the conduct described above adversely impacted the Exchange's ability to surveil for and detect conduct potentially violative of its rules and federal securities laws.

## Failure to Supervise

11. During the period between October 2005 and September 2008, Goldman failed to adequately respond to a number of "red flags" relating to the proper coding of origin codes on orders routed to the options exchanges, in that despite the identification of several of the issues identified in paragraphs six through eight above on several occasions by certain compliance and technology employees of Goldman, Goldman failed to remediate its coding deficiencies until after the Review Period.

12. During the Review Period, Goldman failed to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements, in that Goldman failed to: (i) reasonably address origin code requirements in the development and programming of its order entry systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train its employees with respect to the significance of properly marking origin codes in its order entry systems; and (iv) adequately supervise its employees with respect to the proper marking of origin codes.

## Other Factors Considered

13. In determining to resolve this matter on the basis set forth in this Stipulation and Consent to Penalty as to the findings of violative conduct and sanctions, Market Regulation took into consideration the following: (i) the significant subsequent remedial measures implemented by Goldman, including systems enhancements in its options order entry systems and the development and delivery of training concerning options origin codes for users of the aforementioned systems; (ii) that Goldman separately paid to the Exchange the shortfall in transactions fees ("Fee Payment") associated with the conduct described

in paragraphs six through ten above; and (iii) Goldman's informing the options exchanges of systems issues that Goldman identified in the course of responding to a regulatory inquiry that affected its assignment of origin codes on certain listed options orders and its ensuing cooperation throughout FINRA's investigation. This Fee Payment fully satisfied all transactions fees owed to the Exchange associated with the conduct described above.

## DECISION

The Hearing Officer, in accepting the Stipulation of Facts and Consent to Penalty, found that Goldman committed the offenses as set forth above.

## PENALTY

In view of the above findings, the Hearing Officer imposed the penalty consented to by Goldman of a censure and a $443,700 fine.

For the Hearing Board

Andrew H. Perkins
Deputy Chief Hearing Officer

5



## Notice of Disciplinary Action Against Goldman, Sachs & Co., a Member Organization

**To:**   Members, Member Organizations, Participants and Participant Organizations

**From:**   John C. Pickford, Enforcement Counsel, NASDAQ OMX PHLX<sup>SM</sup>

**DATE:**   October 10, 2012

**FINRA Matter No. 20100235041**

**Enforcement No. 2012-09**

On September 25, 2012, the Business Conduct Committee (the "Committee") issued a disciplinary decision against Goldman, Sachs & Co. ("Goldman" or the "Firm"), a member organization of the Exchange. In response to a Statement of Charges issued in this action, Goldman submitted an Offer of Settlement, Stipulation of Facts and Consent to Sanctions ("Offer"). Solely to settle this proceeding, and without admitting or denying the charges, Goldman consented to findings that during the period between January 2004 and May 2010 (the "review period"), it had committed violations of Exchange Rules 707, 748, 760 and 785, and Section 17(a) of the Securities Exchange Act of 1934, as amended (the "Act") and Rule 17a-3 promulgated thereunder, in that Goldman improperly marked certain options orders on behalf of broker-dealers and market makers as "customer" through various proprietary order entry systems employed by the Firm to send options orders to the Exchange, resulting in: (i) an inaccurate audit trail; (ii) the potential that, in certain situations, orders and quotations were not properly prioritized and matched, given that orders marked as "customer" had priority over other order types; and (iii) an underpayment of execution fees that would have been remitted to the Exchange had the orders in question been routed using the correct options origin code. Additionally, staff concluded that Goldman had supervisory deficiencies related to these matters. During the period between October 2005 and September 2008, the Firm failed to adequately respond to a number of "red flags" relating to the proper coding of origin codes on orders routed to the options exchanges, in that despite the identification of several of the issues identified above on several occasions by certain compliance and technology employees of the Firm, the Firm failed to remediate its coding deficiencies until after the review period. Furthermore, during the review period Goldman failed to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements, in that the Firm failed to: (i) reasonably address origin code requirements in the development and programming of its order entry systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train its employees with respect to the significance of properly marking origin codes in its order entry systems; and (iv) adequately supervise its employees with respect to the proper marking of origin codes.

The Offer submitted by Goldman was accepted by the Committee and was the basis of its Decision. The Committee found that Goldman had violated Exchange Rules 707, 748, 760 and 785, and Section 17(a) of the Securities Exchange Act of 1934, as amended (the "Act") and Rule 17a-3 promulgated thereunder, concurred in the sanctions consented to by Goldman, and ordered the imposition of the following sanctions against the Firm: (i) a censure; and (ii) a total fine in the amount of $6,750,000 due to the Exchange and seven other U.S. options exchanges (the Chicago Board Options Exchange, Inc.; BATS Exchange, Inc.; Boston Options Exchange LLC; The NASDAQ Options Market; International Securities Exchange, LLC; NYSE Amex; and NYSE Arca, Inc.), of which $448,459 shall be paid to PHLX.

---

For more information, contact:

- John C. Pickford, Enforcement Counsel, NASDAQ OMX PHLX, at +1 215 496 5273

© Copyright 2009 The NASDAQ OMX Group, Inc. All Rights Reserved.



# 2012 Final Disciplinary Actions
## as of December 31, 2012

The following is a list of disciplinary actions that have resulted in the imposition of penalties for violations of specified provisions of the federal securities laws and/or the Constitution and Rules of the Exchange. New actions are added to the list as and when they are finalized.

**A.) Disciplinary Sanctions Imposed Pursuant to ISE Rule 1614, Imposition of Fines for Minor Rule Violations:**

- A member was fined $1,000 when it submitted an Expiring Exercise Declaration past the 5:30 P.M. decision cut-off time (ISE Rule 1100).

- A member was fined $2,500 when it submitted an Expiring Exercise Declaration past the 5:30 P.M. decision cut-off time (ISE Rule 1100).

- A member was fined $1,000 when it submitted an Expiring Exercise Declaration past the 2:30 P.M. decision cut-off time (ISE Rule 1100).

- A member was fined $1,000 when it submitted an Expiring Exercise Declaration past the 2:30 P.M. decision cut-off time (ISE Rule 1100).

- A member was fined $1,000 when it submitted an Expiring Exercise Declaration past the 2:30 P.M. decision cut-off time (ISE Rule 1100).

- A member was fined $1,000 when it failed to expose an order it represented as agent for one (1) second prior to entering the offsetting and interacting firm proprietary order (ISE Rule 717(d)).

**B.) Disciplinary Sanctions Imposed Pursuant to ISE Rule 1603, Letters of Consent:**

- RBC Capital Markets, LLC ("RBC") was fined $40,000 failing to accurately report its Large Options Position Report ("LOPR") during the first and third quarters of 2010 in violation of ISE Rule 415(a). Specifically, during the first quarter of 2010, RBC submitted 108 entries to LOPR in which accounts with the same Social Security Number ("SSN") or Tax Identification Number ("TIN") had not been assigned an in-concert number and in-concert firm identification. During the third quarter of 2010, RBC submitted 148 entries to LOPR in which accounts with the same SSN or TIN had not been assigned an in-concert number and in-concert firm identification.

- Oppenheimer & Co. Inc. ("Oppenheimer") was fined $60,000 failing to accurately report its LOPR during the first and third quarters of 2010 in violation of ISE Rule 415(a). Specifically, during the first quarter of 2010, Oppenheimer submitted 192 entries to LOPR in which accounts with the same SSN or TIN had not been assigned

an in-concert number and in-concert firm identification. During the third quarter of 2010, Oppenheimer submitted 356 entries to LOPR in which accounts with the same SSN or TIN had not been assigned an in-concert number and in-concert firm identification.

- E*Trade Clearing LLC ("E*TRADE") was fined $70,000 for failing to accurately report its LOPR during the first and third quarters of 2010 in violation of ISE Rule 415(a). Specifically, during the first quarter of 2010, E*TRADE submitted 471 entries to LOPR in which accounts with the same SSN or TIN had not been assigned an in-concert number and in-concert firm identification. During the third quarter of 2010, E*TRADE submitted 568 entries to LOPR in which accounts with the same SSN or TIN had not been assigned an in-concert number and in-concert firm identification.

- Linkbrokers Derivatives Corporation ("Linkbrokers") was fined $6,500 and $6,388 in unpaid execution fees for violations of ISE Rule 717(e) when it flipped on three occasions a total of 1,350 contracts, such that the solicited order was represented as unsolicited and the unsolicited order was represented as solicited, thereby not properly exposing the actual unsolicited order to the market for the opportunity of price improvement and also removing market competition from the solicited order. Additionally, Linkbrokers violated ISE Rule 712(a) when it misrepresented nine orders resulting in the execution of 31,940 contracts as "customer" instead of "firm." All such violations occurred during the period of January 2009 through February 2010.

- Exane, Inc. ("Exane") was fined $15,000 and paid $330 in unpaid execution fees for order entry violations during the period between April 2009 and March 2010 ("review period"). Specifically, during the review period, Exane improperly utilized the Solicited Order Mechanism, or otherwise failed to properly enter and expose orders it had represented as agent, in that for 14 separate crossing orders, it represented a solicited order as unsolicited and an unsolicited order as solicited, which failed to expose the unsolicited order to the market for the opportunity for price improvement in violation of ISE Rules 716(e) and 717(e). Additionally, during the review period, Exane entered three orders on the ISE, totaling 1,650 contracts, with incorrect information regarding account type in violation of ISE Rule 712(a). During the same period, Exane failed to reasonably supervise its employees to assure compliance with applicable ISE rules in violation of ISE Rule 401.

- Legent Clearing, LLC ("Legent") was fined $25,000 for accepting and submitting a late exercise notice for the CLDA Jan 20 calls on behalf of one of its customers after material news had been disseminated on the underlying issue in violation of ISE Rules 400, 401, 1100(c), 1100(f), 1100(j) and 1100(k). Legent also violated ISE Rule 401 for having inadequate supervisory procedures to review EEDs in accordance with ISE rules.

- Track Data Securities Corporation ("TRAC") was fined $10,000 for failing to take reasonable steps to establish that the intermarket sweep orders it routed met the definitional requirements set forth in Rule 600(b)(30) of Regulation NMS in violation of ISE Rule 2107 and SEC Rule 611(c) of Regulation NMS during the period between November 6, 2008 and January 21, 2010. Additionally, during the same period, TRAC's supervisory system did not provide for supervision reasonably

2

designed to achieve compliance with respect to ISE Rule 2107 and SEC Rule 611(c) of Regulation NMS in violation of ISE Rule 401.

- UBS Securities LLC ("UBS") was fined $30,000 for trade-through violations. During the first and second quarter of 2010, UBS, as a PMM, effected 11 and 15 options transactions, respectively, at prices that were inferior to the National Best Bid and Offer in violation of ISE Rules 803(c) and 1901. Additionally, during the same period, UBS violated ISE Rule 401 by failing to establish appropriate policies and procedures for supervision and control, including a separate system of follow-up and review, to ensure compliance with applicable ISE rules regarding the avoidance of trade-through violations.

- Goldman, Sachs & Co. ("Goldman") was fined $1,074,788 and paid $899,440 in uncollected fees, for improperly marking certain options orders on behalf of broker-dealers and market makers as "customer" through various proprietary order entry systems employed by Goldman to send options orders to the Exchange, during the period between January 2004 and May 2010, in violation of ISE Rules 400, 712(a), and 1400(a), and Section 17(a) of the Securities Exchange Act of 1934, and Rule 17a-3. Additionally, Goldman had supervisory deficiencies related to these matters, including failing to adequately respond to a number of "red flags" relating to the proper coding of origin codes on orders routed to the Exchange, violating ISE Rule 401.

- Ronin Capital, LLC was fined $95,000 for violating ISE Rules 804(e)(2)(i) amended Rule 804(e)(2)(ii)[1], and 904(a)(2) by failing to participate in the opening rotation on 592 occasions, and Rules 804(e)(2)(ii), amended ISE Rules 804(e)(2)(iii)[2], and 904(a)(2) by failing to continuously quote intra-day in all series of an option class it had the obligation to quote on 26,955 occasions during the time period of January 2011 through April 2012.

- Barclays Capital, Inc. ("Barclays") was fined $35,000 for conduct that occurred between the third quarter of 2010 and the first quarter of 2011. Barclays was in violation of ISE Rule 717(e) when, on 22 orders (74 executions – each execution is considered a violation), it flipped the solicited and unsolicited sides of the orders, thus failing to expose the unsolicited order for at least one second prior to executing solicited orders against it on behalf of its non-ISE member client. Such client submitted the subject orders directly to ISE through their sponsored access arrangement with Barclays.

- Credit Suisse Securities (USA) LLC was fined $20,000 for violating ISE Rule 412 on the following occasions: between April 19, 2010 and April 28, 2010, one of the firm's customers exceeded the position limit on the bearish side of the market in the Financial Select Sector SPDR on eight consecutive days of trading; between May

---

[1] On September 21, 2011, ISE Rule 804(e)(i) became ISE Rule 804(e)(ii) as a result of the launch of the ISE CMM Trading Rights Program.
[2] On September 21, 2011, ISE Rule 804(e)(ii) became ISE Rule 804(e)(iii) as a result of the launch of the ISE CMM Trading Rights Program.

3

24, 2010 and May 28, 2010, another customer of the firm exceeded the position limit on the bearish side of the market in the iShares MSCI Emerging Markets Index on five consecutive days of trading; and on August 10, 2011, the firm exceeded the position limit on the bullish side of the market in the iShares FTSE China 25 Index Fund.

- Merrill Lynch Professional Clearing Corp. was fined $15,000 for violations of ISE Rule 803(b)(4) for failing to be within the prescribed opening quote spread differentials during the fourth quarter 2010 through the third quarter 2011.

# NYSE ARCA, INC.

**HEARING BOARD DECISION 12-ARCA-8**  **September 20, 2012**

GOLDMAN, SACHS & CO.  FINRA Proceeding No. 20100235041-02
OTP HOLDER

> **Violated: (i) NYSE Arca Options Rules 6.68, 11.1(b) and 11.16(a), and Section 17(a) of the Securities Exchange Act of 1934 and Rule 17a-3 promulgated thereunder, by improperly marking options orders on the Exchange as "customer" through various proprietary order entry systems Goldman employed to send options orders to the Exchange; and (ii) NYSE Arca Options Rule 11.18, by failing to maintain supervisory systems and controls, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements. Consent to censure and a $671,305 fine.**

## Appearances:

For FINRA Market Regulation – Legal:    For Goldman, Sachs & Co.:

Eric S. Brown, Esq.    James D. Van De Graaff, Esq.
David E. Rosenstein, Esq    Beth A. Stekler, Esq.
Robert A. Marchman, Esq.    David Markowitz, Esq.

* * *

A Hearing Officer at the Financial Industry Regulatory Authority ("FINRA") considered an Offer of Settlement and Consent entered into between the Legal Section of the Market Regulation Department at FINRA ("Market Regulation") on behalf of the General Counsel of NYSE Arca, Inc. ("NYSE Arca" or "Exchange")[1] and Respondent Goldman, Sachs & Co. ("Goldman"), an NYSE Arca Options Trading Permit Holder.[2]

---

[1] FINRA is handling this matter on behalf of NYSE Regulation and NYSE MKT pursuant to a Regulatory Services Agreement among NYSE Group, Inc., New York Stock Exchange LLC, NYSE Arca, Inc., NYSE Amex, NYSE Regulation, and FINRA, which became effective June 14, 2010.

[2] The Offer of Settlement and Consent is conditioned upon acceptance of parallel settlement agreements in related matters between Goldman and the following options exchanges: (i) the Chicago Board Options Exchange, Inc.; (ii) BATS Exchange, Inc.; (iii) Boston Options Exchange LLC (BOX became a facility of NASDAQ OMX BX in August 2008); (iv) The NASDAQ Options Market; (v) NASDAQ OMX PHLX, Inc.; (vi) International Securities Exchange, LLC; and (vii) NYSE MKT, LLC. The Offer of Settlement and Consent provides for an aggregate fine of $6,750,000.

The Offer of Settlement was submitted for the sole purpose of settling this disciplinary proceeding, without adjudication of any issues of law or fact, and without admitting or denying any allegations or findings referred to therein. Market Regulation does not contest the Offer of Settlement and recommends its acceptance. With due regard to the stipulated facts and violations and the proposed sanctions contained therein, the Hearing Officer believes it is appropriate to accept the Offer of Settlement and issues this Decision in accordance with NYSE Arca Options Rules.[3]

## Background and Jurisdiction

1. Goldman is registered with the Securities and Exchange Commission and is a member organization of NYSE Arca. Goldman is a global investment banking, securities, and investment management firm that, among other things, trades securities for institutional and individual customers.

2. In August 2010, Goldman notified NYSE Regulation, through FINRA, that its systems had been preventing Goldman from properly marking many of its options orders on NYSE Arca.

## Overview

3. On behalf of NYSE Regulation, FINRA staff (the "Staff") conducted a review of Goldman's order entry activities during the period between January 2004 and June 2011 (the "Review Period") for compliance with Exchange rules, including NYSE Arca Options Rules 6.68, 11.1(b), 11.16(a), and 11.18, and Section 17(a) of the Securities Exchange Act of 1934, as amended, and Rule 17a-3 promulgated thereunder.

4. Applicable Exchange rules require that, when accepting an order, a member must obtain and record an appropriate code to identify the origin of the order (e.g., customer, broker-dealer, market maker). Such order origin codes are important because, among other things, they affect the accuracy of the Exchange's audit trail and may impact the amount of execution fees due to the Exchange.

5. As a result of its investigation, the Staff concluded that during the Review Period, Goldman violated certain NYSE Arca Options Rules and federal securities laws by improperly marking certain options orders on behalf of broker-dealers and market makers as "customer" through various proprietary order entry systems employed by Goldman to send options orders to the Exchange, resulting in: (i) an inaccurate audit trail; and (ii) an underpayment of execution fees that would have been remitted to the Exchange had the orders in question been routed using the correct options origin code. Additionally, the Staff concluded that Goldman had supervisory deficiencies related to these matters, which are outlined in detail herein.

---

[3] The facts, allegations, and conclusions contained in paragraphs 1 to 16 are taken from the executed Offer of Settlement. For convenient reference, this Decision refers to the governing rules of NYSE Arca, Inc. as "NYSE Arca Options Rules."

## Marking of Options Orders

6. During the Review Period, Goldman and its affiliate, Goldman Sachs Execution & Clearing, L.P. ("GSEC"), maintained multiple proprietary order entry systems for listed options, including G2, Stride, and REDI. The G2 system, implemented in 2004, was designed to handle simple orders. The Stride system, implemented in 2008, was designed to handle complex orders. The REDI system, GSEC's direct market access system, was used by GSEC clients to directly enter orders that would be routed to certain exchanges, including NYSE Arca.

7. During the Review Period, the G2 order entry system was deficient in that, among other things, it only allowed options orders to be coded as "firm," "broker-dealer," or "customer," without including functionality that would enable the selection of orders as "market maker," and defaulted to the "customer" origin code if no origin code category had been explicitly selected by Goldman's sales traders or others entering an order.

8. During the Review Period, the Stride order entry system was deficient in that, among other things, it had been programmed to code all orders as "customer," without any functionality for Goldman's sales traders or others to select an origin code.

9. Insufficient coordination and inadequate communication among the different groups involved in the development of the G2 and Stride systems, including Compliance, Equity Derivative Sales, and Sales Technology, as well as a lack of awareness of the significance of options order origin code regulatory requirements and an inadequate understanding of Goldman's client base for its listed options business among the system developers, contributed to the creation of the deficiencies in the order entry systems previously referenced.

10. As a result of the deficiencies in Goldman's order entry systems described in paragraphs six through eight above, Goldman marked numerous options orders with improper origin codes. In the case of G2 and Stride, the improper marking of these options orders prevented the Exchange from receiving proper execution fees from Goldman, as "customer" orders sent to the Exchange are charged a lower execution rate than other orders. Finally, the conduct described above adversely impacted the Exchange's ability to surveil for and detect conduct potentially violative of its rules and federal securities laws.

## Failure to Supervise

11. NYSE Arca Options Rule 11.18(a) requires each Options Trading Permit ("OTP") Holder or OTP Firm to supervise associated persons to ensure compliance with federal securities laws and NYSE Arca Options Rules. NYSE Arca Options Rule 11.18(b) requires each OTP Holder or OTP Firm to "establish, maintain a system to supervise the activities of its associated persons and the operations of its business. Such system must be reasonably designed to ensure compliance with applicable federal securities laws and regulations and NYSE Arca Rules." NYSE Arca Options Rule 11.18(c) requires each OTP Holder or OTP Firm to "establish, maintain, and enforce written procedures to supervise the

business in which it engages and to supervise the activities of its associated persons that are reasonably designed to ensure compliance with applicable federal securities laws and regulations, and with the NYSE Arca Rules."

12. During the period between October 2005 and September 2008, Goldman failed to adequately respond to a number of "red flags" relating to the proper coding of origin codes on orders routed to the options exchanges. Despite the identification of several of the issues identified in paragraphs six through eight above on several occasions by certain of Goldman's compliance and technology employees, Goldman failed to remediate its coding deficiencies until after the Review Period.

13. During the Review Period, Goldman failed to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements, in that Goldman failed to: (i) reasonably address origin code requirements in the development and programming of its order entry systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train its employees with respect to the significance of properly marking origin codes in its order entry systems; and (iv) adequately supervise its employees with respect to the proper marking of origin codes.

### Other Factors Considered

14. In determining to resolve this matter on the basis set forth in this Offer of Settlement and Consent as to the findings of violative conduct and sanctions, Market Regulation took into consideration the following: (i) the significant subsequent remedial measures implemented by Goldman, including systems enhancements in its options order entry systems and the development and delivery of training concerning options origin codes for users of the aforementioned systems; (ii) that Goldman separately paid to the Exchange the shortfall in transactions fees ("Fee Payment") associated with the conduct described in paragraphs six through ten above; and (iii) Goldman's informing the options exchanges of systems issues that Goldman identified in the course of responding to a regulatory inquiry that affected its assignment of origin codes on certain listed options orders and its ensuing cooperation throughout FINRA's investigation. This Fee Payment fully satisfied all transactions fees owed to the Exchange within the Review Period associated with the conduct described above.

### Violations

15. Goldman violated NYSE Arca Options Rules 6.68, 11.1(b), and 11.16(a), and Section 17(a) of the Exchange Act and Rule 17a-3 promulgated thereunder by improperly marking options orders on the Exchange as "customer" through various proprietary order entry systems Goldman employed to send options orders to the Exchange.

16. Goldman violated NYSE Arca Options Rule 11.18 by failing to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements, in that the

Firm failed to: (i) reasonably address origin code requirements in the development and programming of its systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train its employees with respect to the significance of properly marking origin codes in its order entry systems; (iv) adequately supervise its employees with respect to the proper marking of origin codes; and (v) adequately respond to a number of "red flags" relating to the proper coding of origin codes on orders routed to the options exchanges

## DECISION

The Hearing Officer accepted the Offer of Settlement as set forth above, and found that Goldman committed the violations contained therein.

## PENALTY

In accordance with the Offer of Settlement, Goldman, Sachs & Co. is censured and fined $671,305.

For the Hearing Board

Andrew H. Perkins
Deputy Chief Hearing Officer

Exhibit 3

## BEFORE THE BUSINESS CONDUCT COMMITTEE
## OF THE
## CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED

|  |  |  |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | ) | |
| One Bryant Park | ) | |
| Sixth Floor | ) | |
| New York, NY 10036 | ) | File No. 15-0052 |
| | ) | Star No. 20150453098 |
| and | ) | |
| | ) | |
| Merrill Lynch Professional Clearing Corp. | ) | |
| One Bryant Park | ) | |
| Sixth Floor | ) | |
| New York, NY 10036 | ) | |
| | ) | |
| Subjects | ) | |

## DECISION ACCEPTING LETTER OF CONSENT

This proceeding was instituted by the Business Conduct Committee (the "Committee") of the Chicago Board Options Exchange, Incorporated (the "Exchange") as a result of an investigation by the staff of the Exchange. In order to resolve this matter, the subjects, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp. have submitted a Letter of Consent. Such Letter of Consent was submitted solely for the purposes of this proceeding without admitting or denying that a violation of Exchange Rules has been committed. With due regard to the stipulated facts and findings and the proposed sanction contained therein, the Committee believes it is appropriate to accept the Letter of Consent for File No. 15-0052 (STAR No. 20150453098) which is attached to and made a part of this Decision.

SO ORDERED
FOR THE COMMITTEE

Dated: __June 23, 2015_____     By: __/s/ Bruce Andrews__
                                   **Bruce Andrews**
                                   **Chairman**
                                   **Business Conduct Committee**

**BEFORE THE BUSINESS CONDUCT COMMITTEE**
**OF THE**
**CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED**

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| ) | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated ) | |
| One Bryant Park ) | |
| Sixth Floor ) | |
| New York, NY 10036 ) | |
| ) | |
| and ) | Star No. 20150453098 |
| ) | |
| Merrill Lynch Professional Clearing Corp. ) | |
| One Bryant Park ) | |
| Sixth Floor ) | |
| New York, NY 10036 ) | |
| ) | |
| Subjects ) | |

**LETTER OF CONSENT**

In order to resolve these proceedings pursuant to Chicago Board Options Exchange, Incorporated (the "Exchange" or "CBOE") Rule 17.3, <u>Expedited Proceeding</u>, the Subjects, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Pierce") and Merrill Lynch Professional Clearing Corp. ("Merrill Pro"), hereby submit this Letter of Consent in the above captioned matter. Only for purposes of this proceeding, and without admitting or denying that a violation of Exchange rules has been committed, Merrill Pierce and Merrell Pro consent to the Stipulation of Facts and Findings and Sanction set forth below.

<u>Overview</u>

CBOE staff conducted a review of Merrill Pierce's and Merrill Pro's order origin code entry and/or clearance in their capacity as Trading Permit Holders during the period between in or about January 2004 through in or about February 2014 (the "review period") for compliance with Exchange rules, including CBOE Rules 4.2, 4.22, 6.51 and 15.1; and Section 17(a) of the Securities Exchange Act of 1934, as amended (the "Act") and Rule 17a-3 thereunder.

Applicable Exchange rules require that, when accepting and marking an order, a Trading Permit Holder must obtain and record an appropriate account type or order origin code in each order record and as an order detail when entering orders into the Exchange's systems to indicate the kind of account for which the order will be executed and cleared. Each options market has its own order origin codes, but at a minimum, all have codes to indicate that an order is being executed for a customer, a firm or a market maker. Similarly, when transactions clear at The Options Clearing Corporation ("OCC"), they clear in the "Customer," "Firm," or "Market Maker" range (e.g., clear in the customer account of the Trading Permit Holder's clearing firm at OCC). Such order origin codes are important because, among other things, they affect the accuracy of the Exchange's audit trail, may impact priority of order execution, and ensure that trades were reported to the Exchange and to OCC with accurate trade details.

During the review period, Merrill Pierce and Merrill Pro violated certain federal securities laws and certain CBOE rules by improperly marking numerous options orders on behalf of broker-dealers with incorrect origin codes that were thereafter sent to the Exchange through various order entry systems employed by Merrill Pierce and Merrill Pro to send options orders, resulting in: (i) transactions executed by Merrill Pierce and Merrill Pro that may have traded ahead of other orders entitled to execution priority; (ii) potential adverse impact to the execution price and/or contract quantity of other market participants' orders; (iii) an inaccurate Exchange audit trail and inaccurate books and records; (iv) trades being reported to OCC with inaccurate trade details; and (v) an adverse impact to the Exchange's ability to surveil for and detect potential violations of its rules and of federal securities laws. In addition, the staff concluded that Merrill Pierce and Merrill Pro had supervisory deficiencies related to the improper marking, execution and clearance of incorrect order origin codes, which are outlined in detail herein.

<u>Stipulation of Facts and Findings</u>

1. During all relevant periods herein, Merrill Pierce was an Exchange Trading Permit Holder registered to conduct business on the Exchange as a Market Maker and Floor-Broker.

2. During all relevant periods herein, Merrill Pro was an Exchange Trading Permit Holder registered to conduct business on the Exchange as a Market Maker and Clearing Firm.

3. During all relevant periods herein, Merrill Pierce and Merrill Pro were acting as registered broker-dealers.

4. During all relevant periods herein, Exchange Rules 4.2 – <u>Adherence to Law</u>, 4.22 – <u>Communications to the Exchange or the Clearing Corporation</u>, 6.51 – <u>Reporting Duties</u> and 15.1 – <u>Maintenance, Retention and Furnishing of Books, Records and Other Information</u>; Section 17(a) of the Act and Rule 17a-3 – <u>Records to be Made by Certain Exchange Members, Brokers and Dealers</u> thereunder were in full force and effect.

5. During all relevant periods, Interpretation and Policy .02 to Exchange Rule 6.51 required each Trading Permit Holder, when entering orders on the Exchange, to submit trade information in such form as may be prescribed by the Exchange in order to allow the Exchange to properly prioritize and route orders pursuant to the rules of the Exchange and report resulting transactions to the Clearing Corporation.

6. During all relevant periods, Exchange Rule 4.22 provided, in relevant part: "No Trading Permit Holder, person associated with a Trading Permit Holder or applicant to be a Trading Permit Holder shall make any misrepresentation or omission in any application, report or other communication to the Exchange, or to the Clearing Corporation with respect to the reporting or clearance of any Exchange transaction..."

7. From in or about 2004 through in or about 2014, Merrill Pierce marked and executed numerous option orders with an incorrect order origin code, resulting in the execution of orders, some of which may have been afforded priority to which they were not entitled.

8. From in or about 2004 through in or about 2011, Merrill Pro marked and executed numerous orders with an incorrect order origin code, resulting in the execution of orders, some of which may have been afforded priority to which they were not entitled.

9. From in or about 2004 through in or about 2014, Merrill Pierce failed to implement adequate supervisory procedures and failed to properly supervise to assure compliance with Exchange rules, in that Merrill Pierce failed to assure that its sales traders and floor brokers understood the importance and purpose of order origin codes, and that orders were marked and executed with correct order origin codes.

10. From in or about 2004 through in or about 2014, Merrill Pro failed to properly supervise to assure compliance with Exchange rules, in that Merrill Pro failed to maintain an adequate system of review and oversight designed to detect, prevent and remedy issues related to proper order origin code use. In addition, Merrill Pro failed to assure orders were executed and cleared with the correct order origin codes, including, but not limited to, numerous orders that Merrill Pro submitted to the Exchange and, subsequently made either a post-trade or OCC adjustment to the inaccurate order origin code on behalf of Merrill Pro's professional clients during the approximate time period from in or about 2004 through in or about 2014.

11. From in or about 2004 through in or about 2014, Merrill Pierce failed to maintain accurate books and records as it relates to its electronic order management system, electronic order log and electronic audit trail record that contained, communicated and/or caused Merrill Pierce traders to communicate an incorrect order origin code to the Exchange on numerous orders.

12. The acts, practices, and conduct described in Paragraph 7 above constitute violations of Exchange Rules 4.22 and 6.51 by Merrill Pierce, in that Merrill Pierce marked and executed numerous orders with an incorrect order origin code.

13. The acts, practices, and conduct described in Paragraph 8 above constitute violations of Exchange Rules 4.22 and 6.51 by Merrill Pro, in that Merrill Pro marked and executed numerous orders with an incorrect order origin code.

14. The acts, practices and conduct described in Paragraph 9 above constitute a violation of Exchange Rule 4.2 by Merrill Pierce, in that Merrill Pierce failed to implement adequate supervisory procedures and failed to properly supervise to assure compliance with Exchange rules. Specifically, Merrill Pierce failed to assure that its sales traders and floor brokers understood the importance and purpose of order origin codes and that orders were marked and executed with correct order origin codes.

15. The acts, practices and conduct described in Paragraph 10 above constitute a violation of Exchange Rule 4.2 by Merrill Pro, in that Merrill Pro failed to maintain an adequate system of review and oversight designed to detect, prevent and remedy issues related to proper order origin code use. In addition, Merrill Pro failed to assure orders were executed and cleared with correct order origin codes, including but not limited to numerous orders that Merrill Pro submitted to the Exchange and subsequently made a post-trade or OCC adjustment to the inaccurate order origin code on behalf of Merrill Pro's professional clients.

16. The acts, practices and conduct described in Paragraph 11 above constitute violations of Exchange Rules 4.2 and 15.1; and Section 17(a) of the Act and Rule 17a-3 thereunder by Merrill Pierce, in that Merrill Pierce failed to maintain accurate books and records as it relates to its electronic order management system, electronic order log and electronic order audit trail records that contained, communicated and/or caused Merrill Pierce traders to communicate an incorrect order origin code to the Exchange on numerous orders.

Sanction: A censure of Merrill Pierce and Merrill Pro and a total fine imposed by CBOE and the other options exchanges identified below[1] in the amount of $9,000,000, of which $4,500,000 shall be paid to CBOE.

Merrill Pierce agrees to an undertaking pursuant to which at intervals of 90, 180, 270, and 360 days after acceptance by the Business Conduct Committee of this Letter of Consent, Merrill Pierce shall produce to CBOE, in care of FINRA Market Regulation – Legal (Chicago), its written supervisory procedures pertaining to order origin codes as well as any updates to its written supervisory procedures pertaining to order origin codes. In addition, at intervals of 90, 180, 270, and 360 days after acceptance by the Business Conduct Committee of this Letter of Consent, Merrill Pierce shall make a written submission to CBOE, in care of FINRA Market Regulation – Legal (Chicago), regarding its compliance with CBOE's rules and policies governing the inclusion of account origin codes in order and execution data. At a minimum, the written submission shall address and include the following: (1) an assessment of the degree to which Merrill Pierce has taken additional remedial steps to confirm that it is including accurate account origin codes in its order records and in its electronic entries of order and transaction data in CBOE's systems; (2) the adequacy of Merrill Pierce's policies, systems, procedures and training relating to including accurate account origin codes in its order and execution audit trail data; (3) copies of all exception reports identifying instances in which inaccurate account origin codes were included in Merrill Pierce's order and execution audit trail data; and (4) an explanation of all remedial actions that Merrill Pierce had taken in response to instances appearing on the exception reports produced in response to Paragraph 3.

Merrill Pro agrees to an undertaking to revise its written supervisory procedures with respect to the areas described in Paragraphs 10 and 15. Within 30 days of acceptance of this Letter of Consent by the Business Conduct Committee, a registered principal of Merrill Pro shall submit to CBOE, in care of FINRA Market Regulation – Legal (Chicago), a signed, dated letter, or an e-mail from a work-related account of the registered principal, providing the

---

[1] The balance of the fine amount will be paid to BATS Exchange, Inc.; BOX Options Exchange LLC; NASDAQ OMX BX, Inc.; NASDAQ OMX PHLX LLC; NASDAQ Stock Market LLC; and NYSE Regulation, Inc. on behalf of NYSE Arca Inc. and NYSE MKT LLC.

following information: (1) a reference to this matter; (2) a representation that Merrill Pro has revised its written supervisory procedures to address the deficiencies described in this paragraph; (3) the date the revised procedures were implemented; and (4) a copy of the revised procedures.

Subjects acknowledge that they have read the foregoing Letter of Consent, that no promise or inducement of any kind has been made to them by the Exchange or its staff, and that this Letter of Consent is voluntary on their part.

Subjects understand and acknowledge that the Committee's decision in this matter will become part of their disciplinary record and may be considered in any future Exchange proceeding.

Subjects understand and acknowledge that the acceptance of this Letter of Consent is conditioned upon acceptance of parallel settlement agreements in related matters between Merrill Pierce and Merrill Pro collectively and individually with each of the self-regulatory organizations referenced in Footnote 1.

Subjects also acknowledge that the Committee's decision to accept or reject this Letter of Consent is final, and that they may not seek review thereof in accordance with Exchange Rule 17.3.


Dated:  __May 11, 2015__            By: __/s/ Merrill Lynch, Pierce, Fenner & Smith Incorporated__
                                        **Merrill Lynch, Pierce, Fenner & Smith Incorporated**



Dated:  __May 11, 2015__            By: __/s/ Merrill Lynch Professional Clearing Corp.__
                                        **Merrill Lynch Professional Clearing Corp.**



# Notice of Disciplinary Action against Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp., Member Organizations

| | |
|---|---|
| **To:** | Members, Member Organizations, Participants and Participant Organizations |
| **From:** | John C. Pickford, Assistant General Counsel, NASDAQ OMX PHLX<sup>SM</sup> |
| **DATE:** | June 24, 2015 |

**FINRA Matter No. 20110277299 (includes Matter No. 20110277298)**
**Enforcement No. 2015-04**

On June 8, 2015, the Business Conduct Committee (the "Committee") issued a disciplinary decision against Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Pierce") and Merrill Lynch Professional Clearing Corp. ("Merrill Pro") (collectively, the "Firms"), member organizations of the Exchange. In response to a Statement of Charges issued in this action, the Firms submitted an Offer of Settlement, Stipulation to Findings and Consent to Sanctions ("Offer"). Solely to settle this proceeding, and without admitting or denying the charges, the Firms stipulated to findings that they violated Section 17(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 17a-3 promulgated thereunder, and Exchange Rules 707, 760, 785(c), 1014(g)(i)(A), 1053 and 1063(e)(i), by entering and executing orders with incorrect origin codes, resulting in: (i) transactions executed by the Firms that may have traded ahead of other orders entitled to execution priority; (ii) potential adverse impact to the execution price and quantity of other market participants' orders; (iii) an inaccurate audit trail and inaccurate order records; (iv) trades being reported to The Options Clearing Corporation with inaccurate trade details; and (v) an adverse impact to the Exchange's ability to surveil for and detect potential violations of its rules and federal securities laws. Merrill Pierce did so from 2004 through 2014, and Merrill Pro did so from 2005 through 2011. Additionally, staff concluded that the Firms had supervisory deficiencies related to these matters. In summary, from 2004 to 2014, in violation of Exchange Rule 748, the Firms failed to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements in that the Firms failed to do the following: (i) reasonably address origin code requirements in the development and programming of their order entry systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train their employees with respect to the significance of properly marking origin codes in their order entry systems; and (iv) adequately supervise their employees with respect to the proper marking of origin codes.

The Offer submitted by the Firms was accepted by the Committee and was the basis of its Decision. The Committee found that the Firms violated each of the aforementioned rules, concurred in the sanctions consented to by the Firms, and ordered the imposition of the following sanctions: (i) a censure; (ii) a joint and several fine of $9,000,000, of which

$1,125,000 shall be paid to the Exchange; (iii) an undertaking by Merrill Pierce, pursuant to which at intervals of 90, 180, 270 and 360 days after the Decision on the Offer became final, Merrill Pierce must make a written submission to the Exchange regarding its compliance with Exchange rules, policies and practices governing the inclusion of accurate account origin codes in order and execution records and data; and (iv) an undertaking by Merrill Pro, pursuant to which Merrill Pro must submit, within 30 business days of acceptance of this Offer, a signed dated letter, or an e-mail from a work-related account of the firm's registered principal, providing the following information: (1) a reference to this matter; (2) a representation that Merrill Pro has revised its written supervisory procedures to address its deficiencies; and (3) the date on which the revised procedures were implemented. The Firms will pay the balance of their fine to BATS Exchange, Inc.; Chicago Board Options Exchange, Incorporated; International Securities Exchange, LLC; NASDAQ OMX BX, Inc.; The Nasdaq Options Market LLC; and NYSE Regulation, Inc.

---

For more information, contact:

    John C. Pickford, Enforcement Counsel, NASDAQ OMX PHLX, at +1 215 496 5273

© Copyright 2009 The NASDAQ OMX Group, Inc. All Rights Reserved.

# NYSE MKT LLC

FINRA DEPARTMENT OF MARKET
REGULATION,

                              Complainant,

          v.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED

and

MERRILL LYNCH PROFESSIONAL
CLEARING CORP.,

                          Respondents.

Proceeding No. 20110277299-02 (includes 20110277298)

May 27, 2015

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp. violated Exchange Rules 16, 153, 324, 955(c)(1), 956NY(a)(8), 957NY(e), 963NY(a) and (b), and 964NY(b)(2)(A), as well as Section 17(a)(1) of the Securities Exchange Act of 1934 and SEC Rule 17a-3(a)(6)(i) thereunder by misrepresenting options orders executed on the Exchange with inaccurate account origin codes. Respondents also violated Exchange Rule 320 by failing to reasonably supervise and implement adequate controls, including separate systems of follow-up and review, reasonably designed to achieve compliance with the Exchange's rules and policies governing the use of account origin codes. Consent to a censure, a joint and several fine of $868,000, and an undertaking.**

## Appearances

For FINRA Market Regulation:

W. Kwame Anthony, Esq.
Eric S. Brown, Esq.
David E. Rosenstein, Esq.
Robert A. Marchman, Esq.

For Respondents:

Elizabeth H. Baird, Esq.
Russell M. Fecteau, Esq.
Morgan, Lewis & Bockius, LLP

A Hearing Officer at the Financial Industry Regulatory Authority ("FINRA") considered a Stipulation of Facts and Consent to Penalty entered into between FINRA's Department of Market Regulation on behalf of NYSE Regulation, Inc.[1] and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Pierce") and Merrill Lynch Professional Clearing Corp. ("Merrill Pro.").[2]

The Stipulation of Facts and Consent to Penalty was submitted for the sole purpose of settling this disciplinary proceeding, without adjudication of any issues of law or fact, and without admitting or denying any allegations or findings referred to therein.

The Hearing Officer accepts the Stipulation of Facts and Consent to Penalty and issues this Decision in accordance with NYSE MKT Rules.[3]

## FINDINGS OF FACTS AND VIOLATIONS

### Background and Jurisdiction

1. Merrill Pierce is a Delaware Corporation with its principal place of business in New York, New York, and it has been a Member Organization since 1988.

2. Merrill Pro. is a Delaware Corporation with its principal place of business in New York, New York, and it has been a Member Organization since 1985.

### Overview

3. On behalf of NYSE MKT LLC (the "Exchange"), FINRA staff members (the "Staff") conducted a review of Merrill Pierce's and Merrill Pro's order entry activities during the period between 2004 and 2014 (the "Review Period") for compliance with NYSE MKT Rules, including NYSE MKT Rules 16, 153, 324, 955, 956NY, 957NY, 963NY, and 964NY, and Section 17(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC Rule 17a-3 thereunder.

4. Applicable NYSE MKT Rules require that, when accepting an order, a member must obtain and record an appropriate account type or origin code in each order record and as an order detail when entering orders into the Exchange's systems to indicate the kind of

---

[1] FINRA is handling this matter on behalf of NYSE Regulation, Inc. pursuant to a Regulatory Services Agreement among NYSE Group, Inc., New York Stock Exchange LLC, NYSE Arca, Inc., NYSE Amex (now NYSE MKT LLC), NYSE Regulation, Inc. and FINRA, which became effective June 14, 2010.

[2] Effective May 14, 2012, NYSE Amex LLC was renamed NYSE MKT LLC. Because certain of the conduct at issue occurred before May 14, 2012, and thus the violations were of NYSE Amex Rules, this Decision refers to all of the rules that were in effect during the period referenced in the Stipulation of Facts and Consent to Penalty as "Exchange Rules."

[3] The findings of fact and conclusions in this Decision are based on the Stipulation of Facts and Consent to Penalty submitted by the parties on May 15, 2015.

account for which the order will be executed and cleared. Each options market has its own origin codes, but at a minimum, all have codes to indicate that an order is being executed for a customer, a firm, or a market maker. Similarly, when transactions clear at The Options Clearing Corporation ("OCC"), they clear in the "Customer," "Firm," or "Market Maker" range (i.e., in the clearing member's customer account, firm account, or market maker account at OCC). Origin codes are important because, among other things, they may impact the priority of execution, and they affect the accuracy of the firm's order records and the Exchange's audit trail. In addition, origin codes must be accurate as part of ensuring that trades are reported to OCC with accurate trade details.

5.  During the Review Period, Merrill Pierce and Merrill Pro violated certain NYSE MKT Rules and federal securities laws when entering and executing certain orders on behalf of their broker-dealer clients. The firms improperly marked numerous options orders with incorrect origin codes and sent those orders to the Exchange through various order entry systems employed by the firms to send options orders, resulting in the following: (i) transactions executed by the firms that may have traded ahead of other orders entitled to execution priority; (ii) potential adverse impact to the execution price and quantity of other market participants' orders; (iii) an inaccurate audit trail and inaccurate order records; (iv) trades being reported to OCC with inaccurate trade details; and (v) an adverse impact to the Exchange's ability to surveil for and detect potential violations of its rules and of federal securities laws. Additionally, the Staff concluded that the firms had supervisory deficiencies related to these matters, which are outlined in detail herein.

**Violations**

**Inaccurate Origin Codes**

6.  NYSE MKT required the use of origin codes beginning prior to 2004. It codified its requirements in Rule 153 in January 2005 and again in Rule 956NY in February 2009. Among other things, the origin code determines the order's execution priority and is part of the audit trail data for every transaction.

7.  From 2004 through 2014, Merrill Pierce executed numerous transactions with incorrect origin codes across multiple markets, including the Exchange. Merrill Pierce's execution of orders with incorrect origin codes resulted from certain accounts having been on-boarded[4] with incorrect origin codes in their respective account profiles (e.g., an account that should have been coded as "Firm" was coded as "Customer," and some orders entered for that account were entered incorrectly with the "Customer" origin code), limitations in its order management system that failed to include all potential origin code designations or defaulted to an improper origin code, and from errors made by Merrill Pierce employees when placing origin codes on orders at the point of order acceptance, entry, or execution.

---

[4] "On-boarding" refers to the process of setting up a client's account in Merrill Pierce's or Merrill Pro's order management system.

8.    From 2005 until July 2011, when Merrill Pro ceased accepting orders for execution, Merrill Pro executed numerous transactions with incorrect origin codes across multiple markets, including the Exchange. Merrill Pro used incorrect account origin codes to execute trades for certain accounts because it had placed the wrong origin code in the account profiles of those accounts at on-boarding.

9.    Despite the fact that in each year from 2004 through 2010, the firms traded millions of contracts by executing orders with incorrect origin codes, they lacked procedures for ensuring that orders had been entered with correct origin codes, and for conducting reviews to detect that orders had been entered and executed with incorrect origin codes. Instead, the firms only learned about misrepresented orders in isolation—for example, when reconciling positions on their books with positions at OCC on the day after a trade, when a client complained that an order had been executed with an incorrect origin code, or when an exercise had taken place incorrectly—and then addressed each instance in isolation and on an ad hoc basis.

10.   In approximately 2007, an employee in Merrill Pro's Chicago office, who handled origin code issues for both firms, began gathering data to respond to an increasing number of regulatory inquiries in connection with FINRA's investigation of the use of incorrect origin codes by Merrill Pro's customers. In 2010, this employee grew concerned that in instances when Merrill Pierce's traders had executed trades and requested origin code changes, making origin code changes at the exchanges and making post-trade adjustments at OCC could evidence regulatory violations or bring regulatory scrutiny. Despite this knowledge, neither firm had taken measures to ensure that it executed orders with correct origin codes, or to detect instances in which it had executed orders with incorrect origin codes.

11.   Although Merrill Pierce began taking steps in 2010 to address the execution of orders with incorrect origin codes, including conducting a review that led to the creation and implementation of exception reports to identify instances in which it had executed orders with incorrect origin codes, it still continued trading hundreds of thousands of contracts each year with incorrect origin codes through 2014.

12.   Merrill Pro never addressed its ongoing deficiencies relating to its inaccurate use of origin codes before it stopped transmitting and executing orders altogether in July 2011.

13.   Each instance in which Merrill Pierce or Merrill Pro executed an order with an incorrect origin code could have had adverse consequences, such as creating inaccurate order records, inadvertently trading ahead of other orders in the marketplace that were entitled to execution priority, impacting the price and quantity of subsequent transactions, creating an inaccurate audit trail, reporting trades to OCC with inaccurate trade details, and adversely impacting the Exchange's ability to surveil for and detect potential violations of its rules and federal securities laws.

14. By marking orders with the wrong origin code, Merrill Pierce and Merrill Pro violated the following rules:

   a. Section 17(a)(1) of the Exchange Act and SEC Rule 17a-3(a)(6)(i) thereunder requiring that member organizations create a memorandum of each order, and any other instruction, showing the terms and conditions of the order;

   b. Exchange Rule 16, which requires every member organization to adhere to the principles of good business practice in the conduct of its affairs;

   c. Former Exchange Rule 153, which required member organizations to maintain a record of every order, including information required by the Exchange Act, and Commentary .01;

   d. Exchange Rule 956NY(a)(8), which requires inclusion of an account origin code in every order record;

   e. Exchange Rule 324, which requires member organizations to keep true and complete records in accordance with Exchange Rules, the Securities Exchange Act of 1934, and the rules thereunder;

   f. Exchange Rule 955(c)(1), which requires the entry of details of every order into the Exchange's Electronic Order Capture System;

   g. Exchange Rule 957NY(e), which requires the reporting of trade information, including the proper account origin code, for each option transaction that Merrill Pierce or Merrill Pro effected and for which each was responsible;

   h. Exchange Rule 963NY(a) and (b), which gives Customer orders priority over other bids and offers at the same prices with respect to orders executed by open outcry; and

   i. Exchange Rule 964NY(b)(2)(A), which gives Customer accounts first priority over other bids or offers in the Consolidated Book at the same price.

**Supervision**

15. Exchange Rule 320(b) requires each business activity of a member organization to be under the supervision and control of the member organization establishing it and personnel with appropriate supervisory authority and responsibility. Such persons must discharge their supervisory duties with respect to compliance with securities laws and regulations, and Exchange rules. Rule 320(c) requires a member organization to provide for appropriate supervisory control, including a separate system of follow-up and review, to verify that delegated supervisory authority is properly exercised. Rule 320(e) requires a member organization to establish a system of compliance and supervisory controls reasonably designed to achieve compliance with applicable securities laws and regulations and Exchange rules.

16.    Merrill Pierce and Merrill Pro each violated Exchange Rule 320 by failing to have adequate supervisory systems and controls in place, including written supervisory procedures and separate systems of follow-up and review, that were reasonably designed to achieve compliance with the Exchange's origin code requirements.

17.    Prior to October 2010, Merrill Pierce did not have any exception reports to identify incorrect origin codes on orders and had no system whatsoever for conducting reviews to ensure that correct origin codes were placed on orders. Instead, Merrill Pierce often learned it had used incorrect origin codes only when its clients informed it that trades had been executed with an incorrect origin code, or because problems arose when trades had cleared in the wrong range at OCC (e.g., clearing in the "Customer" range when they were supposed to have cleared in the "Firm" range). These instances resulted in discrepancies between Merrill Pierce's positions on its own books and its positions on OCC's books. Merrill Pierce would then make adjustments at OCC to move positions into the proper range. After that time, whenever a certain employee within Merrill Pro became concerned that making origin code adjustments could invite regulatory scrutiny or action, the employee informed others within the organization that adjustments would only be made if certain other employees approved them. Yet, the violations continued. Additionally, despite instituting an exception report and supervisory reviews in 2010, Merrill Pierce continued entering and executing orders with incorrect origin codes through 2014.

18.    Merrill Pro never had a system for identifying incorrect origin codes on orders or conducting any reviews to ensure correct origin codes were placed on orders. Instead, as with Merrill Pierce, Merrill Pro learned that trades had been entered with incorrect origin codes as a result of discrepancies between its positions on its own books and its positions with OCC. In addition, through 2014, Merrill Pro never had a system of supervision to ensure that the trades for which it was the clearing firm cleared with the correct origin codes at OCC.

19.    In summary, during the period between 2004 and 2014, the firms failed to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements in that the firms failed to do the following: (i) reasonably address origin code requirements in the development and programming of its order entry systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train its employees with respect to the significance of properly marking origin codes in its order entry systems; and (iv) adequately supervise its employees with respect to the proper marking of origin codes.

## DECISION

Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp. violated Exchange Rules 16, 153, 324, 955(c)(1), 956NY(a)(8), 957NY(e), 963NY(a) and (b), and 964NY(b)(2)(A), as well as Section 17(a)(1) of the Securities Exchange Act of 1934 and

6

SEC Rule 17a-3(a)(6)(i) thereunder by misrepresenting options orders executed on the Exchange with inaccurate account origin codes.

Respondents also violated Exchange Rule 320 by failing to reasonably supervise and implement adequate controls, including separate systems of follow-up and review, reasonably designed to achieve compliance with the Exchange's rules and policies governing the use of account origin codes.

## PENALTY

Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp. are censured and jointly and severally fined $868,000. In addition, Merrill Pierce and Merrill Pro shall undertake the following:[5]

Merrill Pierce shall at intervals of 90, 180, 270, and 360 days after the date of this Decision make a written submission to NYSE Regulation, Inc., in care of FINRA, regarding its compliance with the Exchange's rules and policies governing the inclusion of account origin codes in order and execution data. At a minimum, each written submission shall address and include the following:

    a. an assessment of the degree to which Merrill Pierce has taken additional remedial steps to confirm that it is including accurate account origin codes in its order records and in electronic entries of order and transaction data in the Exchange's's systems;

    b. the adequacy of Merrill Pierce's policies, systems, procedures, and training relating to including accurate account origin codes in its order and execution audit trail data;

    c. copies of all exception reports identifying instances in which inaccurate account origin codes were included in Merrill Pierce's order and execution audit trail data; and

    d. an explanation of all remedial actions that Merrill Pierce had taken in response to instances appearing on the exception reports produced in response to the previous subparagraph c.

---

[5] The Offer of Settlement and Consent Merrill Pierce and Merrill Pro submitted to NYSE MKT is similar to settlement agreements in related matters between Merrill Pierce and Merrill Pro collectively and individually with each of the following self-regulatory organizations: BATS Exchange, Inc.; Chicago Board Options Exchange, Incorporated; International Securities Exchange, LLC; NASDAQ OMX BX, Inc.; NASDAQ OMX PHLX LLC; NASDAQ Options Market LLC; and NYSE Regulation, Inc. on behalf of NYSE Arca, Inc., individually. The aggregate settlement amount across all markets is $9,000,000.

Merrill Pro shall revise its written supervisory procedures with respect to the areas described in paragraph 18. Within 30 business days of the date of this Decision, a registered principal of Merrill Pro shall submit to the COMPLIANCE ASSISTANT, LEGAL SECTION, MARKET REGULATION DEPARTMENT, 9509 KEY WEST AVENUE, ROCKVILLE, MD 20850, a signed, dated letter, or an e-mail from a work-related account of the registered principal to MarketRegulationComp@finra.org, providing the following information: (1) a reference to this matter; (2) a representation that Merrill Pro has revised its written supervisory procedures to address the deficiencies described in paragraph 18; and (3) the date the revised procedures were implemented.

Andrew H. Perkins
Chief Hearing Officer

8

# NYSE ARCA, INC.

| | |
|---|---|
| FINRA DEPARTMENT OF MARKET REGULATION, | |
| Complainant, | |
| v. | Proceeding No. 20110277299-01 (includes 20110277298) |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED | May 27, 2015 |
| and | |
| MERRILL LYNCH PROFESSIONAL CLEARING CORP., | |
| Respondents. | |

> **Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp. violated Section 17(a)(1) of the Securities Exchange Act of 1934, Rule 17a-3(a)(6)(i) thereunder, and NYSE Arca Options Rules 6.68(a)(8), 6.69, 11.1(b), 11.16(a), and 11.18(a) by failing to place the correct origin codes on orders. Respondents also violated NYSE Arca Options Rule 11.18 by failing to provide an adequate system of supervision, including written procedures and a system of follow-up and review, with respect to compliance with NYSE Arca Options rules and policies governing the use of account origin codes on orders. Consent to a censure, a joint and several fine of $417,000, and an undertaking.**

## Appearances

For FINRA Market Regulation:

W. Kwame Anthony, Esq.
Eric S. Brown, Esq.
David E. Rosenstein, Esq.
Robert A. Marchman, Esq.

For Respondents:

Elizabeth H. Baird, Esq.
Russell M. Fecteau, Esq.
Morgan, Lewis & Bockius, LLP

A Hearing Officer at the Financial Industry Regulatory Authority ("FINRA") considered an Offer of Settlement and Consent entered into between FINRA's Department of Market

Regulation on behalf of NYSE Regulation, Inc.[1] and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Pierce") and Merrill Lynch Professional Clearing Corp. ("Merrill Pro").

The Offer of Settlement and Consent was submitted for the sole purpose of settling this disciplinary proceeding, without adjudication of any issues of law or fact, and without admitting or denying any allegations or findings referred to therein.

The Hearing Officer accepts the Offer of Settlement and Consent and issues this Decision in accordance with NYSE Arca Options Rules.[2]

## FINDINGS OF FACTS AND VIOLATIONS

### Background and Jurisdiction

1.  Merrill Pierce is an OTP Firm[3] and became registered with NYSE Arca Inc. ("NYSE Arca Options" or the "Exchange") in 1958. Merrill Pro is an OTP Firm and became registered with the Exchange in 1977.

### Overview

2.  On behalf of the Exchange, FINRA staff members (the "Staff") conducted a review of Merrill Pierce's and Merrill Pro's order entry activities during the period between 2004 and 2014 (the "Review Period") for compliance with NYSE Arca Options Rules, including NYSE Arca Options Rules 6.68, 6.69, 11.1, 11.16, and 11.18, and Section 17(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC Rule 17a-3 thereunder.

3.  Applicable NYSE Arca Options Rules require that, when accepting an order, a member must obtain and record an appropriate account type or origin code in each order record and as an order detail when entering orders into the Exchange's systems to indicate the kind of account for which the order will be executed and cleared. Each options market has its own origin codes, but at a minimum, all have codes to indicate that an order is being executed for a customer, a firm, or a market maker. Similarly, when transactions clear at The Options Clearing Corporation ("OCC"), they clear in the "Customer," "Firm," or "Market Maker" range (i.e., in the clearing member's customer account, firm account, or market maker account at OCC). Origin codes are important because, among

---

[1] FINRA is handling this matter on behalf of NYSE Regulation, Inc. and NYSE Arca, Inc. pursuant to a Regulatory Services Agreement among NYSE Group, Inc., New York Stock Exchange LLC, NYSE Arca, Inc., NYSE Amex (now NYSE MKT LLC), NYSE Regulation, Inc. and FINRA, which became effective June 14, 2010.

[2] The facts, allegations, and conclusions contained in this Decision are taken from the executed Offer of Settlement and Consent submitted on May 15, 2015.

[3] Pursuant to NYSE Arca Rule 1.1(r), an OTP Firm is a corporation or other organization that holds an Options Trading Permit issued by NYSE Arca.

other things, they may impact the priority of execution, and they affect the accuracy of the firm's order records and the Exchange's audit trail. In addition, origin codes must be accurate as part of ensuring that trades are reported to OCC with accurate trade details.

4.  During the Review Period, Merrill Pierce and Merrill Pro violated certain NYSE Arca Options Rules and federal securities laws when entering and executing certain orders on behalf of their broker-dealer clients. The firms improperly marked numerous options orders with incorrect origin codes and sent those orders to the Exchange through various order entry systems employed by the firms to send options orders, resulting in: (i) transactions executed by the firms that may have traded ahead of other orders entitled to execution priority; (ii) potential adverse impact to the execution price and quantity of other market participants' orders; (iii) an inaccurate audit trail and inaccurate order records; (iv) trades being reported to OCC with inaccurate trade details; and (v) an adverse impact to the Exchange's ability to surveil for and detect potential violations of its rules and of federal securities laws. Additionally, the Staff concluded that the firms had supervisory deficiencies related to these matters, which are outlined in detail herein.

## Violations

### Inaccurate Origin Codes

5.  Pursuant to NYSE Arca Options Rules 6.67, 6.68(a)(8), and 6.69, Commentary .01, any order entered into the Exchange's Electronic Order Entry Capture system, which is the Exchange's electronic audit trail and order tracking system, must include the account origin code, such as "C" to indicate that an order is for a non-broker-dealer customer account, "F" for a firm proprietary account, and "M" for a Market Maker account, as well as other codes.

6.  From 2004 through 2014, Merrill Pierce executed numerous transactions with incorrect origin codes across multiple markets, including the Exchange. Merrill Pierce's execution of orders with incorrect origin codes resulted from certain accounts having been on-boarded[4] with incorrect origin codes in their respective account profiles (e.g., an account that should have been coded as "Firm" was coded as "Customer," and some orders entered for that account were entered incorrectly with the "Customer" origin code), limitations in its order management system that failed to include all potential origin code designations or defaulted to an improper origin code at various points during the Review Period, and from errors made by Merrill Pierce employees when placing origin codes on orders at the point of order acceptance, entry, or execution.

---

[4] "On-boarding" refers to the process of setting up a client's account in Merrill Pierce's or Merrill Pro's order management system.

7.  From 2005 until July 2011, when Merrill Pro ceased accepting orders for execution, Merrill Pro executed numerous transactions with incorrect origin codes across multiple markets, including the Exchange. Merrill Pro used incorrect account origin codes to execute trades for certain accounts because it had placed the wrong origin code in the account profiles of those accounts at on-boarding.

8.  Despite the fact that in each year from 2004 through 2010, the firms traded millions of contracts by executing orders with incorrect origin codes, they lacked procedures for ensuring that orders had been entered with correct origin codes, and for conducting reviews to detect that orders had been entered and executed with incorrect origin codes. Instead, the firms only learned about misrepresented orders in isolation—for example, when reconciling positions on their books with positions at OCC on the day after a trade, when a client complained that an order had been executed with an incorrect origin code, or when an exercise had taken place incorrectly—and then addressed each instance in isolation and on an ad hoc basis.

9.  In approximately 2007, an employee in Merrill Pro's Chicago office, who handled clearing for both firms' clients, began gathering data to respond to an increasing number of regulatory inquiries in connection with FINRA's investigation of different Merrill Pro customers' use of incorrect origin codes. In 2010, this employee grew concerned that in instances when Merrill Pierce's traders had executed trades and requested origin code changes, making origin code changes at the exchanges and making post-trade adjustments at OCC could evidence regulatory violations or bring regulatory scrutiny. Despite this knowledge, neither firm had taken measures to ensure that it executed orders with correct origin codes, or to detect instances in which it had executed orders with incorrect origin codes.

10. Although Merrill Pierce began taking steps in 2010 to address the execution of orders with incorrect origin codes, including conducting a review that led to the creation and implementation of exception reports to identify instances in which it had executed orders with incorrect origin codes, it still continued trading hundreds of thousands of contracts each year with incorrect origin codes through 2014.

11. Merrill Pro never addressed its ongoing deficiencies relating to its inaccurate use of origin codes before it stopped transmitting and executing orders altogether in July 2011.

12. Each instance in which Merrill Pierce or Merrill Pro executed an order with an incorrect origin code could have had adverse consequences, such as creating inaccurate order records, inadvertently trading ahead of customer orders, impacting the price and quantity of subsequent transactions, creating an inaccurate audit trail, reporting trades to OCC with inaccurate trade details, and adversely impacting the Exchange's ability to surveil for and detect potential violations of its rules and federal securities laws.

4

13. By marking orders with the wrong origin code, Merrill Pierce and Merrill Pro violated the following rules:

    a. Section 17(a)(1) of the Exchange Act and SEC Rule 17a-3(a)(6)(i) thereunder requiring that member organizations create a memorandum of each order, and any other instruction, showing the terms and conditions of the order.

    b. NYSE Arca Options Rule 6.68(a)(8), which requires OTP Firms to maintain a record of every order that includes, among other things, the account origin code.

    c. NYSE Arca Options Rule 6.69, which requires OTP Firms to report each options transaction to the exchange and to include the account origin code in the reports. Rule 6.69 also states that each OTP Firm that is a clearing member is responsible to OCC for all trade information filed with Arca.

    d. NYSE Arca Options Rule 11.1(b), which requires every OTP Firm to adhere to the principles of good business practice in the conduct of its business affairs at all times.

    e. NYSE Arca Options Rule 11.16(a), which requires every OTP Firm to make and keep records as prescribed by Arca and by the Exchange Act and rules thereunder.

    f. NYSE Arca Options Rule 11.18(a), which prohibits an OTP Firm from engaging in conduct in violation of the federal securities laws and Arca Rules.

**Supervision**

14. NYSE Arca Options Rule 11.18(a) requires an OTP firm to supervise associated persons with respect to compliance with federal securities laws and Arca rules. Rule 11.18(b) requires an OTP firm to establish and maintain a supervisory system that is reasonably designed to ensure compliance with applicable federal securities laws and regulations and NYSE Arca Rules. Rule 11.18(c) requires an OTP firm to establish, maintain, and enforce written procedures to supervise its business and associated persons, and the procedures must be reasonably designed to ensure compliance with applicable securities laws and regulations and NYSE Arca rules.

15. Merrill Pierce and Merrill Pro each violated NYSE Arca Options Rule 11.18 by failing to have adequate supervisory systems and controls in place, including written supervisory procedures and separate systems of follow-up and review, that were reasonably designed to achieve compliance with the NYSE Arca's origin code requirements.

16.    Prior to October 2010, Merrill Pierce did not have any exception reports to identify incorrect origin codes on orders and had no system whatsoever for conducting reviews to ensure that correct origin codes were placed on orders. Instead, Merrill Pierce often learned it had used incorrect origin codes only when its clients informed it that trades had been executed with an incorrect origin code, or because problems arose when trades had cleared in the wrong range at OCC (e.g., clearing in the "Customer" range when they were supposed to have cleared in the "Firm" range). These instances resulted in discrepancies between Merrill Pierce's positions on its own books and its positions on OCC's books. Merrill Pierce would then make adjustments at OCC to move positions into the proper range. After that time, whenever a certain employee within Merrill Pro became concerned that making origin code adjustments could invite regulatory scrutiny or action, the employee informed others within the organization that adjustments would only be made if certain other employees approved them. Yet, the violations continued. Additionally, despite instituting an exception report and supervisory reviews in 2010, Merrill Pierce continued entering and executing orders with incorrect origin codes through 2014.

17.    Merrill Pro never had a system for identifying incorrect origin codes on orders or conducting any reviews to ensure correct origin codes were placed on orders. Instead, as with Merrill Pierce, Merrill Pro learned that trades had been entered with incorrect origin codes as a result of discrepancies between its positions on its own books and its positions with OCC. In addition, through 2014, Merrill Pro never had a system of supervision to ensure that the trades for which it was the clearing firm cleared with the correct origin codes at OCC.

18.    In summary, during the period between 2004 and 2014, the firms failed to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the Exchange's origin code requirements in that the firms failed to do the following: (i) reasonably address origin code requirements in the development and programming of its order entry systems; (ii) maintain written supervisory procedures reasonably designed to achieve compliance with the Exchange's rules relating to the assignment of origin codes; (iii) adequately train its employees with respect to the significance of properly marking origin codes in its order entry systems; and (iv) adequately supervise its employees with respect to the proper marking of origin codes.

## DECISION

Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp. violated Section 17(a)(1) of the Exchange Act, SEC Rule 17a-3(a)(6)(i) thereunder, and NYSE Arca Options Rules 6.68(a)(8), 6.69, 11.1(b), 11.16(a), and 11.18(a) by failing place the correct origin codes on orders.

Respondents also violated NYSE Arca Options Rule 11.18 by failing to provide an adequate system of supervision, including a written procedures and a system of follow-up and review, with respect to compliance with NYSE Arca Options rules and policies governing the use of account origin codes on orders.

## SANCTIONS

Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corp. are censured and jointly and severally fined $417,000. In addition, Merrill Pierce and Merrill Pro shall undertake the following:[5]

Merrill Pierce shall at intervals of 90, 180, 270, and 360 days after the date of this Decision make a written submission to NYSE Regulation, Inc., in care of FINRA, regarding its compliance with the Exchange's rules and policies governing the inclusion of account origin codes in order and execution data. At a minimum, each written submission shall address and include the following:

  a. an assessment of the degree to which Merrill Pierce has taken additional remedial steps to confirm that it is including accurate account origin codes in its order records and in electronic entries of order and transaction data in the Exchange's systems;

  b. the adequacy of Merrill Pierce's policies, systems, procedures, and training relating to including accurate account origin codes in its order and execution audit trail data;

  c. copies of all exception reports identifying instances in which inaccurate account origin codes were included in Merrill Pierce's order and execution audit trail data; and

  d. an explanation of all remedial actions that Merrill Pierce had taken in response to instances appearing on the exception reports produced in response to the previous subparagraph c.

Merrill Pro shall revise its written supervisory procedures with respect to the areas described in paragraph 17. Within 30 business days of the date of this Decision, a registered principal of Merrill Pro shall submit to the COMPLIANCE ASSISTANT, LEGAL SECTION, MARKET REGULATION DEPARTMENT, 9509 KEY WEST AVENUE, ROCKVILLE, MD 20850, a signed, dated letter, or an e-mail from a work-related account of the registered principal to MarketRegulationComp@finra.org, providing the following information: (1) a reference to this

---

[5] The Offer of Settlement and Consent Merrill Pierce and Merrill Pro submitted to NYSE Arca is similar to settlement agreements in related matters between Merrill Pierce and Merrill Pro collectively and individually with each of the following self-regulatory organizations: BATS Exchange, Inc.; Chicago Board Options Exchange, Incorporated; International Securities Exchange, LLC; NASDAQ OMX BX, Inc.; NASDAQ OMX PHLX LLC; NASDAQ Options Market LLC; and NYSE Regulation, Inc. on behalf of NYSE MKT LLC, individually. The aggregate settlement amount across all markets is $9,000,000.

matter; (2) a representation that Merrill Pro has revised its written supervisory procedures to address the deficiencies described in paragraph 17; and (3) the date the revised procedures were implemented.

The sanctions shall take effect immediately.

Andrew H. Perkins
Chief Hearing Officer